# Richmond.

## DIRECTOR GENERAL OF RAILROADS *v.* PENCE'S ADMINISTRATRIX.

### March 15, 1923.

Absent, Burks and West, JJ.

1. CROSSINGS—*Obstruction—Negligence of Railroad in Permitting View of Crossing to be Obstructed.*—Where a railroad company at a crossing permitted the presence of a car on a siding and lumber piles along the track obstructing the view of the crossing from the highway, the railroad is not guilty of negligence. The only effect of the presence of the car and the lumber piles was to impose on both a traveler approaching the crossing and the railroad a greater degree of caution than would have been required if these obstructions had not existed.

2. CROSSINGS—*Obstructions at Crossings—Speed of Train.*—Where a view of a highway crossing was obstructed, it could not be said as a matter of law that it would not be negligence for the railroad to run a train faster than usual at this crossing. In the instant case one witness testified that the train was running faster than usual when it approached the crossing and the jury might have believed this witness.

3. CROSSINGS—*Warnings at Crossings—Common Law and Statutory Duty—Case at Bar.*—At common law it is the duty of a railroad to give warnings for a crossing, but if the statutory warnings are given the railroad cannot be required to do more in that respect. In other words, in the instant case, an action for death at a crossing, if the employees on the train blew for the crossing, and then continued to blow or to ring the bell until the crossing was reached as the statute requires, nothing more could have been expected or exacted of them, either at common law or under the statute, as to warnings.

4. CROSSINGS—*Warnings at Crossings—Conflict in the Testimony—Negative Evidence—Question for Jury.*—In the instant case, an action for death at a crossing, the engineer and fireman, who were more or less corroborated by a number of witnesses, most of them employees of defendant railroad, but some of them not connected with the road, testified that the crossing signal was sounded and the bell was rung in full compliance with the statute. A number of other witnesses for the plaintiff testified that they did not hear the bell and the whistle. Most of the testimony to that effect was of a negative character, but

a companion of deceased testified that he stopped and listened for the signals and heard no bell or whistle when the train was certainly within a few feet of him.

*Held:* That the question of whether the signals were given was for the jury.

5. APPEAL AND ERROR—*Review of the Sufficiency of the Evidence by the Appellate Court Where the Case has to be Reversed on Other Grounds—Section 6365 Code of 1919—Expression of Opinion Upon Weight of Evidence.* Under the former practice of the Supreme Court of Appeals, the sufficiency of the evidence to sustain the verdict, where the case had to be reversed on other grounds, was not passed upon, but in view of section 6365 of the Code of 1919, if there had been no proof at all of negligence on the part of the defendant in the instant case, it would have been the duty of the Supreme Court of Appeals to enter a final judgment and dismiss the case. The court, therefore, had to go into the question of negligence far enough to show that it could not dismiss the case for insufficient evidence of negligence, but with the caution that nothing it said was to be used before the jury at another trial as indicating that it had expressed an opinion upon the weight of the evidence.

6. NEGLIGENCE—*Imputable Negligence—Joint Adventure—Driver of Automobile and Passenger—Case at Bar.*—In the instant case, an action for death in a collision at a railroad crossing, the driver of the car and the deceased were performing different services, acting in different capacities, and were following the instructions of separate and independent employers. It was distinctly a part of the contract between their employers that a car and a driver should be provided for deceased, but under the evidence deceased was clearly not supposed to have any control over the route taken or the manner in which the car was driven.

*Held:* That deceased and the driver of the car were not engaged in such a joint enterprise that the negligence of the driver was imputable to deceased.

7. NEGLIGENCE—*Imputable Negligence—Joint Adventure—Driver of Automobile and Passenger.*—The "joint enterprise" which will render the contributory negligence of a driver imputable to a person riding with him must invest such person with some voice in the control and direction of the vehicle. The rule is founded upon the doctrine of principal and agent. The passenger must be so related to the driver as that the maxim *"Qui facit per alium facit per se"* is applicable.

8. CROSSINGS—*Contributory Negligence—Question for Jury—Case at Bar.*—In the instant case, an action for death in a collision at a railway crossing, the driver of the automobile in which deceased was riding stopped to look and listen before crossing the track, and was proceeding to make the crossing at a very low rate of speed, with his

car under perfect control. The fireman of the engine which struck the automobile testified that the automobile was going so slowly that it looked like it was coming to a stop, and deceased might reasonably have assumed that the driver would stop. There were other considerations which might reasonably explain why deceased did not make any outcry or attempt to do anything to avoid the accident.

*Held:* That, under all the circumstances, it would have been error for the lower court to take from the jury the question of the contributory negligence of deceased.

9. CROSSINGS—*Obstructions—Instructions—Erroneous and Indefinite Instructions—Reference to Declaration—Case at Bar.*—In an action for death in a collision between an automobile and a train at a highway crossing, where the view was obstructed by a railroad car standing on a spur track and piles of lumber along the right of way, an instruction that it was the duty of the employees of the railroad, in the operation and management of cars and trains on the main track of the railroad and on the adjoining spur track, to exercise ordinary care to avoid injury to persons traveling on the road, and that the failure on their part to exercise such care as to any of the duties charged in the declaration would be negligence was erroneous, as it opened the door wide for an assumption by the jury that the storing of the cars on the side track near the crossing was negligent management. The instruction was also too indefinite, in practically turning the jury loose to find the defendant guilty of any negligence which might be based upon a breach of "any duties charged in the declaration," which cover ten pages of the printed record.

10. APPEAL AND ERROR—*Assignment of Error—General Assignment—Instructions—Reference to Declaration.*—An assignment of error did not specifically say that the jury ought not to have been generally referred to the charges in a long and complicated declaration, but it did allege that the instruction was "too indefinite, leaving to the jury to say just what the railroad should have done in the particular case," which could have been given no other meaning than that the reference in the instruction to "any duties charged in the declaration" was too general.

11. APPEAL AND ERROR—*Crossings—Instructions.*—Where the court erred by charging that a failure on the part of the defendant as to any duties charged in the declaration would be negligence, the error is not waived by the fact that defendant asked the court to tell the jury "that the burden of proving the negligence charged in the declaration is upon the plaintiff." The instruction, which related merely to the burden of proof, could not have misled the jury, and was not given in such a context as to have amounted to an invitation

to the court to commit the error complained of in the other instruction.

12. NEGLIGENCE—*Instructions—Reference to the Negligence Charged in the Declaration.*—A reference to "the negligence charged in the declaration" in an instruction is not to be construed in every case as reversible error, even though it be necessary for the jury before rendering its verdict to look to the declaration to find what the negligence complained of is. Sometimes a declaration is very brief and simple. Every case in this respect must depend upon its own facts.

13. RAILROADS—*Crossings—Obstructions at Crossings—Instructions—Case at Bar.*—In the instant case, an action for death in an accident at a railroad crossing, the court instructed the jury that a failure on the part of the defendant to exercise ordinary care as to "any duties charged in the declaration" would be negligence. One of the charges in the declaration was that it was negligence for the defendant to store cars on a side track obstructing the view of the crossing, and there was nothing in the evidence to sustain this charge.

*Held:* That the instruction was without evidence to support it.

14. CROSSINGS—*Obstructions at Crossings—Instructions—Reversible Error—Case at Bar.*—In the instant case, an action for death occurring in an accident at a highway crossing, the verdict for the plaintiff depended upon conflicting evidence. In view of the instructions, it was impossible to say that the jury found for the plaintiff either upon the failure of defendant to give the requisite signals, or upon excessive speed of the train, the only two grounds upon which there was sufficient evidence to support the verdict. The jury might have found for the defendant on these grounds, and under the instructions as given held the defendant liable because they believed there was negligence in leaving cars standing near the crossing, obstructing the view. Therefore, this error in the instructions was reversible error.

15. APPEAL AND ERROR—*Harmless Error—General Rule.*—The doctrine of harmless error is favored by the Supreme Court of Appeals, and it will not interfere with a verdict when it can be said that a case has been fairly tried upon its merits. But the doctrine cannot be applied where there would be serious risk of requiring defendant to pay heavy damages in the case where upon correct instructions the jury might have found a contrary verdict.

16. APPEAL AND ERROR—*Remand for New Trial Upon Reversal—Retrial Upon All Points—Damages.*—In accordance with the provisions of section 6365 of the Code of 1919, the order entered in the instant case upon reversal and remand for a new trial directed that the case should not be retried as to the amount of damages, as that question was fairly developed at the present trial, and there was no error assigned as to the instructions thereon, or as to the amount of the verdict.

Error to a judgment of the Circuit Court of Brunswick county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed and remanded for new trial.*

The opinion states the case.

*Williams, Loyall & Tunstall, Hall, Wingfield & Apperson, Nat. Turnbull* and *W. C. Plunkett,* for the plaintiff in error.

*Buford & Peterson* and *C. T. Lassiter,* for the defendant in error.

Kelly, P., delivered the opinion of the court.

Robert Pence, while riding in an automobile, was struck and killed by a Virginian Railroad train at a crossing and his administratrix brought this action for damages against the Director General who at the time of the accident was operating the railroad. There was a verdict and judgment below in favor of the plaintiff, and the defendant assigns error.

The facts of the case so far as material for the purposes of this decision may be fairly stated thus:

Pence was a traveling salesman employed by the International Harvester Company. At the time of the accident he was riding in a Ford runabout driven by Shirley Stillwell, a traveling salesman employed by W. H. Harrison Company. The harvester company was the manufacturer of a certain type of plows which it wished to sell by wholesale to the Harrison Company, a local dealer. The volume of the sales by the harvester company to the Harrison Company depended upon the

success of the latter in selling the plows to the local trade. For the mutual benefit of both companies an arrangement was entered into between them whereby the harvester company agreed to furnish a salesman to visit the customers of the Harrison Company and sell plows to them, and the Harrison Company in turn agreed to furnish a car and driver to take the salesman around over the country and introduce him to the trade. Pursuant to this arrangement the harvester company sent Robert Pence, and the Harrison Company furnished the car and sent one of its traveling salesmen, Shirley Stillwell, who acted as driver of the car and also introduced Pence to the parties who were expected to buy the plows. Stillwell was acquainted with the country and with the contemplated customers, and Pence was a stranger to both. It was a joint enterprise in the sense that both companies would be benefited by the sales, and also in the sense that Pence and Stillwell were working at it together, but neither Pence nor Stillwell originated the scheme, and they were paid by and acting under the orders of their respective employers. Their connection with the undertaking and their relationship with each other are very well shown by the following extracts from the testimony of Mr. Geo. W. Harrison, the manager of the Harrison Company: "The International Harvester Company was to furnish us a salesman which, at this time, happened to be Mr. Pence, and we, in turn, were to furnish a car and driver. Mr. Stillwell was carrying Mr. Pence around, introducing him to the trade, not acting in the capacity of a salesman at all. Mr. Pence was doing the selling. * * * Mr. Pence's duties were simply one of a salesman. On this particular trip he was to sell plows only. This territory was all new to Mr. Pence and Mr. Stillwell went along, more or less in the capacity of a driver, intro-

ducing him to the trade, and Mr. Pence was strictly the salesman. It was a new line of goods with us and naturally Mr. Stillwell didn't know anything about it. The expenses of Mr. Pence were paid by the International Harvester Company as well as his salary. We paid Mr. Stillwell and furnished the car." It further appeared in the statement of the witness W. J. Floyd, who testified for the defendant, that the two men came to his store together on or about the day of the accident and were both selling the plows, but he summed up the situation in his final statement as follows: "Mr. Pence, I believe, was the salesman and seemed to be and Mr. Stillwell was encouraging the sale. He said that they would be shipped through his house, W. H. Harrison Company, if I bought."

It further seems clear from the evidence that Pence had no authority or control over Stillwell, either as to the places to be visited or as to the operation of the car, and that Pence's salary was a fixed sum for the year and not dependent upon the result of the particular business in which he was engaged at the time of his death.

The accident occurred on December 12, 1919, at a point in the unincorporated village of Alberta, where the main line of the Virginian railroad crosses a public road which is known in the village as Main street. The population in the village numbers about one hundred and fifty, and the crossing is very generally used by the people there, as well as by others having occasion to cross the tracks at that point. The road crosses the tracks approximately at right angles. The car in which Pence and Stillwell were riding was coming south. At the crossing, which is about 600 yards west of the station at Alberta, the company maintains three tracks nearly parallel with each other and running east and west. The first, counting from the north, is a spur

track known as the Wheeler track; next is the passing track, and next the main line. Just east of the crossing, on the north side, there is a cut, the land on that side of the road rising gradually from the north until it reaches a height of several feet at the crossing. On the day of the accident there were several piles of lumber along the top of this cut, and two box cars were standing on the Wheeler track west of the crossing and within three or four feet of the county road. These obstructions—the cut, the lumber and the box cars—obscured the view of the two other tracks to such an extent that Pence and Stillwell could not have seen a train coming from the west until they had passed the end of the box cars. In making this statement of the situation the figures we use are practically correct, but we have not undertaken to attain mathematical precision in this respect. The distance between the south rail of the Wheeler track and the north rail of the passing track was twenty-five feet, and the distance from the south rail of the Wheeler track to the north rail of the main track was forty feet. A Ford runabout is eleven feet three inches long, and the back of the driver's seat is seven feet from the extreme front end of the car. The tracks are perfectly straight from the crossing west for a distance of 1,728 feet. When the occupants of the car reached a point, which for convenience we shall call "A," where their position on the seat was about three feet south of the south rail of the Wheeler track, they had a clear view of the main line to the west for a distance of 200 feet. With the occupants of the car in that position the rear wheels of the car were between the rails of the Wheeler track and the front wheels were fifteen feet from the north rail of the passing track, and twenty-eight feet from the north rail of the main track. When the car had moved forward thirteen feet from the

point "A" to a point which we shall call "B," its occupants had a clear view of the track to the west (except as obstructed by the train) for a distance of 340 feet. In that position the front wheels of the car were about two feet from the north rail of the passing track, and about fifteen feet from the north rail of the main track. At a point which we shall call "C," in the center of the passing track, the occupants of the car had a clear view of the main track (except as obstructed by the train) for 1,728 feet to the west. Their front wheels were then about four feet from the main track. As the car moved from "A" to "C," the view gradually extended; and it is perfectly manifest that there was a point between the Wheeler track and the passing track where the car could have been stopped free from danger from either track, and where the occupants would have had a clear view of the main track west for a distance of more than 840 feet.

As the automobile approached the Wheeler track from the north, Stillwell drove very slowly and finally stopped just before he reached that track. He looked and listened for a train but saw and heard none, and then proceeded across the track in low gear at a speed of about five miles an hour. He described his movements at this point as follows:

"Q. How were you driving the car?

"A. As I came up I came along pretty fast until I got near the track and then I slowed up slow and I got right to it and finally came to a stop.

"Q. You are talking about the side track?

"A. Yes. Then I looked to the right and couldn't see anything and looked to the left.

"Q. Did you hear anything?

"A. I didn't hear anything and I stopped and listened. I couldn't hear anything either way and couldn't see anything, and I came to the conclusion that nothing

was coming and started up again in low gear, and when I was past the box car far enough to see up the track the train hit me. I didn't see the train. The train hit me. I only remember blot of some kind and that is all. I remember seeing the vision of something and that is all.

"Q. According to your recollection what was the distance between the side track and the first of the tracks that appeared to you to be main tracks?

"A. I thought there wasn't eleven or twelve feet until you were actually on the track and I thought both of those tracks were main tracks. Both of them looked like they had been used as much as the other.

\* \* \* \*

"Q. After you started up again did you hear any bell or whistle?

"A. I didn't hear no bell and didn't hear no whistle and I still continued to listen to try to hear if anything was coming."

The steering wheel, and hence the driver's position, was on the left, and Pence was sitting on the right hand side. The curtains on the car extended from the back of the top toward the front and came down from the top flush with the front of the seat on which these parties were riding. It affirmatively appears that the curtains did not interfere with Stillwell's view to the right; and while the evidence is not quite so clear as to Pence, upon the undisputed facts it is manifest that by leaning slightly forward he could easily have seen as much as the driver could see.

When the collision occurred Pence was instantly killed and Stillwell was injured and rendered unconscious. The automobile was carried some distance on the cow catcher of the engine, and the train was stopped in a distance of about 500 feet. It appears to be conceded that the automobile was running at five miles an

hour and that the speed of the train was thirty miles an hour. Of course these are estimates, but they appear to be relatively correct. It is not possible to say exactly how close the train was to the crossing when the automobile came in sight from the end of the box cars, but it was quite near. The engineer, from his position on the right side of the engine, did not see it at any time before the accident, and he testified that this was because he was so close that his view was cut off by the boiler.

The fireman testified that when he saw the car it was only about seventy feet ahead of him, that it was coming very slowly, that he thought it was going to stop, and that after he found this conclusion was wrong, there was no chance for him to do anything to avert the accident.

We have discussed the situation at the crossing fully, but as a matter of fact in this particular case the view of the track for any greater distance than 200 feet west of the crossing is not material, because the evidence shows that as the car passed from the end of the box cars to about point "A" above, the train was then in sight and, at the utmost, not more than 200 feet away. A situation like this cannot be described with entire precision, but the relative positions of the train and the automobile as here given are fairly established by the testimony of eye witnesses when viewed in the light of mathematical calculations based upon certain physical facts. It is conceded that the car was making about seven feet per second and the train about forty-two feet per second, and at this rate they met on the crossing. We know that the car had to travel about twenty-eight feet after it was at point "A." We have, therefore, this known distance and the known rate of speed at which the train and the car were respectively travel-

ing, and the result seems to be inevitable that when the car was at "A," the engine was about 168 feet away. It is said more than once in the brief of counsel for the plaintiff that the accident happened in less than two seconds after the train came in sight. This, of course, was an inadvertence and cannot be true unless the car was traveling twice as fast as Stillwell said it was. If it was running only five miles an hour, it required about four seconds for him to traverse the distance between the point "A," at which he could have seen the engine, and the crossing.

We do not overlook the fact that the fireman says he did not see the car until the engine was within about seventy feet of the crossing, and that the car was then still north of the passing track. It must be remembered, however, that the fireman did not undertake to be exact in his estimate, and, furthermore, unless we assume that he was mistaken, as he may well have been, in this estimate, then the car was running very much faster than any witness said it was. If the engine was only seventy feet away before the car reached the passing track, the train would have been more than half over the crossing before the car could possibly have gotten there. The witness, McDowell, who was on the south side of the tracks, forty-five feet from the center of the main line, first saw the train when it was some distance away, and a moment later observed the relative positions of the engine and car; and he testified that the engine was about 150 feet (to use his figures, fifty yards) from the crossing when the car was between the Wheeler track and the passing track. The statement of this witness appears to be approximately correct when tested by the respective rates of speed involved.

1. The first question to be determined is whether the

evidence shows any actionable negligence on the part of the defendant company. It is a little remarkable—indeed the case is almost unique in this respect—that no contention is made for a recovery upon the perhaps overworked doctrine of the last clear chance. The plaintiff relies wholly upon the original negligence of the defendant, divided into two general classes (1) alleged violation of the common law duty of exercising reasonable care to avoid injury to travelers at a highway crossing, and (2) violation of the statutory duty to give certain signals at such crossing.

[1] With respect to the common law duty of the defendant, it is shown that the crossing was obstructed by the end of the cut, by the piles of lumber, and by the box cars. These were conditions created by the defendant, and which it had the right to create, but their existence obligated it to operate its trains at that point with a reasonable regard to such conditions, and also, of course, obligated persons using the crossing to have due regard therefor in attempting to cross the tracks. As very well said in the petition upon which this writ of error was granted, "the mere presence of the cars and lumber piles along the Wheeler track was not negligence, and the only effect of their presence was to impose on both Pence and the defendant a greater degree of caution than would have been required if these obstructions had not existed." This common law duty on the part of both the traveler and the company is fully recognized by the authorities. As held in *A. & D. Ry. Co.* v. *Reiger*, 95 Va. 418, 28 S. E. 590: "If the view of a train approaching a railroad crossing is obstructed by cars left standing on a side track, it is the duty of the railroad company, in the running of its trains, and also of the traveler in approaching the crossing, to use a higher degree of care

than if no such obstruction existed." See also *Southern Ry. Co.* v. *Bryant,* 95 Va. 212, 28 S. E. 183; *Petersburg R. Co.* v. *Hite,* 81 Va. 767, 768, 769.

[2] With due regard to conditions at the crossing, it may be safely said that the only negligence, except the failure to give the statutory signals, which the evidence at all tends to prove is that the train was perhaps running at a higher rate of speed than usual at this crossing. Upon this point one witness, and so far as we recall, only one, testified that the train was running faster than usual. Her testimony on this point was as follows:

"Q. State to the jury where you were and what you were doing?

"A. I was in the town hall at Alberta, about seventy-five yards from the crossing and I looked west. The train was coming in that direction and I noticed that it was running faster than usual and it attracted my attention. I paused a moment and looked at it and remarked at the time, 'Running in now to make up for lost time.'

"Q. It was running faster than trains usually run?

"A. Yes, it was running faster than usual is why it attracted my attention and caused me to make the remark.

\*      \*      \*      \*

"Q. You were attracted by the fact, according to your testimony, that the train was running a little faster than usual?

"A. A little faster than usual was why it called my attention and caused me to make that remark.

"Q. How much faster?

"A. I couldn't tell about that and you couldn't, either.

"Q. You imagined it was running faster that day?

"A. I knew it was.

"Q. How much faster than usual, do you think?

"A. I couldn't tell you that."

The usual speed was not shown. The jury might have believed this witness. Under the circumstances existing at that time and place we could not say as a matter of law that it would not be negligence to run faster than usual at this crossing.

[3] A great deal has been said in argument about the common-law duty to give warnings for a crossing, and this common-law duty undoubtedly exists, but if the statutory warnings were given the company could not, we think, have been required to do anything more in that respect. In other words, if the employees on the train blew for the crossing and then continued to blow or to ring the bell until the crossing was reached, as the statute requires, nothing more could have been expected or exacted of them either at common law or under the statute as to warnings.

[4] As to whether the statutory signals were given, the evidence is in this condition: The engineer and fireman, who are more or less corroborated by a number of witnesses, most of them employees of the defendant company, but some of them not connected with the road in any way, testified that the crossing signal was sounded and that the bell was rung in full compliance with the statute. A number of other witnesses for the plaintiff testified that they did not hear the bell and the whistle. Most of the testimony to this effect is of a negative character, but taking it in connection with Stillwell's statement that after he had stopped north of the crossing and then started up again he continued to listen and heard no bell or whistle, when the train was then certainly within a few feet of him, we have reached the conclusion that whether the signals were given was a question for the jury.

[5] Under the former practice, before this court was

given the power to enter final judgment in such cases as this, we did not as a rule pass upon the sufficiency of the evidence where the case had to be reversed on other grounds, but now, in view of section 6365 of the Code, if there had been no proof at all of negligence on the part of the defendant, it would have been our duty to enter a final judgment here and dismiss the case. We have, therefore, gone into this question of negligence far enough to show that we cannot dismiss the case for insufficient evidence of negligence. But nothing that we have said is to be used before the jury at another trial as indicating that we have expressed an opinion upon the weight of the evidence. We are not saying what we would do if it were our duty to pass upon the weight of the evidence, and to settle the conflicts in the testimony.

[6] 2. We come next to consider whether the alleged contributory negligence of the driver can be imputed to Pence.

It is contended by the defendant that because Stillwell and Pence were engaged in a joint enterprise any negligence of the former was chargeable to the latter. This contention is not well founded. The joint enterprise in which Stillwell and Pence were engaged was, as pointed out above, not one instituted by them. They were performing different services, acting in different capacities, and were following the instructions of separate and independent employers. It was distinctly a part of the contract between their employers that a car and driver should be provided for Pence, who, under the evidence, was clearly not supposed to have any control over the route taken or the manner in which the car was driven.

In the case of *W. & O. D. Ry. Co.* v. *Zell*, 118 Va. 755, 88 S. E. 309, we said: "Where two persons are engaged

in a joint enterprise or adventure in the use of an automobile, even though the enterprise or adventure be only a pleasure trip, the contributory negligence of either, within the scope of the enterprise, will bar a recovery by the other." This is a correct statement of the law as applied to the facts of the *Zell Case.* If the trip which Zell and his companion Peck (who owned and was driving the car) were making when Zell was killed had been a business enterprise, he and Peck would have been partners. They were in the habit of taking similar trips together, and Zell was often the driver; and he was usually the one to get the car out and see that it was ready for the drive. On the last and fatal trip he appears to have been chiefly responsible for the adventure.

[7] But the "joint enterprise" which will render the contributory negligence of a driver imputable to a person riding with him must invest such person with some voice in the control and direction of the vehicle. The rule is founded upon the doctrine of principal and agent. The passenger must be so related to the driver as that the maxim *"Qui facit per alium facit per se"* is applicable. As said by this court in *Va. R. & P. Co.* v. *Gorsuch,* 120 Va. 655, 91 S. E. 632, Ann. Cas. 1918B, 838: "The doctrine of imputable negligence has been discussed and the books are full of cases dealing with the question. There are some conflicts in the decisions, but it may be regarded as settled by the overwhelming weight of authority that the negligence of the driver of an automobile will not be imputed to a mere passenger, unless the passenger has or exercises control over the driver."

[8] 3. This brings us to a consideration of the defendant's contention that Pence himself was guilty of contributory negligence. This question, like that with respect to the primary negligence of the defendant, in our opinion addressed itself to the jury, and their finding

thereon binds us. We are not now concerned with the negligence of the driver, because, as we have seen, if he was negligent, his want of care cannot be imputed to his passenger. As to Pence himself, we are unable to say that fair minded men might not reasonably differ as to whether he acted under the circumstances as an ordinarily prudent man might have been expected to act. Stillwell, his driver and guide through the country, had stopped to look and listen before crossing the Wheeler track, and was proceeding to make the crossing at a very low rate of speed with his car apparently under perfect control. It appears in evidence that Pence sat still and said nothing. We cannot say why he did this. It may be that he saw and heard the train. If so, he might naturally and reasonably have assumed that Stillwell also saw it and would stop before reaching the main track. Stillwell could easily have done this, and it is exactly what the fireman, looking at him from the engine, thought Stillwell would do, for he testified that when he saw the car it was going so slow that it looked like it was coming to a stop, and that when he saw it would not stop it was too late for him to attempt to call the engineer's attention to the danger. There are other considerations which might be mentioned as reasonably explaining why Pence did not make any outcry or attempt to do anything to avoid the accident. We do not deem it necessary to go into these considerations, but will content ourselves by saying that under all the circumstances we hold that it would have been error for the lower court to take from the jury the question of the contributory negligence of the plaintiff's decedent.

The case of *Va. & S. W. Ry. Co.* v. *Skinner*, 119 Va. 843, 89 S. E. 887, and *Southern Ry. Co.* v. *Jones*, 118 Va. 685, 88 S. E. 178, both of which are relied upon very strongly by counsel for the defendant, are, as we think,

distinguishable from the case at bar by the fact that in both of them the negligence of the driver was necessarily apparent to the passenger, whereas in this case the passenger was justified in assuming that the automobile would stop before the collision occurred.

[9] 4. It only remains to determine whether the trial court committed any error in the instructions to the jury upon the law of the case. We shall dispose of the questions arising upon the instructions in the order in which they are presented in the petition for the writ of error.

It is insisted that the court erred in giving instruction A on behalf of the plaintiff as follows:

"The court instructs the jury that it was the duty of the officers and officials and their agents and employees in charge of the railroad of the Virginian Railway Company under the authority of the act of Congress of the United States, as mentioned in the declaration, *in the operation and management of cars and trains* on the main track of the said railroad, *and on the adjoining switch and spur track*, to exercise ordinary care to avoid injury to persons traveling on the road on which Robert Pence was traveling when he met his death at the crossing, and a failure on their part to exercise such care, *as to any duties charged in the declaration*, if the jury shall believe from the evidence that there was such failure on their part, would be negligence." (Italics added.)

It is urged that this instruction was inaccurate and confusing in its reference to the "operation" and "management" of cars and trains "on the adjoining switch and spur tracks," the argument being that there was no pertinent evidence of any use by the defendant of the switch and spur tracks except as to the two box cars, and that there was no proven negligence in the placing of those cars. This seems to us to be a good objection

to the instruction. It opened the door wide for an assumption by the jury that storing cars on the side track near the crossing was negligent management, and, indeed, it could hardly have been otherwise construed when there was no evidence at all in the case except as to the box cars to which this language in the instruction could have been applied. Counsel for the plaintiff argued before us that the reference to the other tracks merely described the situation at the crossing, and they cite *N. & W. Ry. Co.* v. *Munsell*, 109 Va. 417, 64 S. E. 50, as authority for this position; but the instruction in the *Munsell Case* was one which fully described the situation, setting forth the unusual surroundings and dangerous condition of the place, and told the jury that under these surroundings and conditions it was the duty of the company to give warnings of the approach of the train. That is not this case, and the language of instruction A cannot fairly be given the effect here contended for.

Another objection urged against instruction A is that it is "too indefinite, leaving to the jury to say just what the railroad should have done in the particular case." This, too, we think is a good objection, and we cannot say that it is cured by any other instructions given in the case. It practically turns the jury loose to find the defendant guilty of any negligence which might be based upon a breach of "any duties charged in the declaration," which declaration covers ten pages of the printed record. It is not a simple or easy task to analyze the charges of negligence intended to be set forth in this declaration, and it was not safe to impose that task upon the jury. See *Curtis & Shumway* v. *Williams* (Va.), 86 S. E. 848; *Jones* v. *Richmond*, 118 Va. 612, 623, 88 S. E. 82.

[10] It is said that this particular objection to the in-

struction is not pointed out in the assignment of error. It is true that the assignment does not specifically say that the jury ought not to have been thus generally referred to the charges in the declaration, but it does contain the language quoted above and cannot well be given any other meaning than that the reference to the declaration was too general.

[11] Nor can it be said that the error was waived, or that the defendant is precluded from assigning the error by reason of the fact that in defendant's instruction No. 10 the court was asked to tell the jury, and did tell them, "that the burden of proving the negligence charged in the declaration is upon the plaintiff." That instruction, which related merely to the burden of proof, could not have misled the jury and was not given in such a context as to have amounted to an invitation to the court to commit the error complained of in instruction A.

[12] We do not mean to lay down a hard and fast rule that a reference to "the negligence charged in the declaration" in an instruction shall in every case be construed as reversible error, even though it be necessary for the jury before rendering its verdict to look to the declaration to find what the negligence complained of is. Sometimes a declaration is very brief and simple. Every case in this respect must depend upon its own facts. Where the reason of the rule exists, the rule will be applied; otherwise not.

[13] But even if the instruction were right in form, in the particular feature now under consideration, it is radically wrong in substance. One of the charges in the declaration is that it was negligence to store cars on the side track, and there was nothing in the evidence to sustain this charge. The instruction is so phrased as that the jury, if they attempted to analyze the declara-

tion, might well have been led to the erroneous conclusion that the railroad company had no right to stand the cars in such close proximity to the crossing. In other words the instruction was without evidence to support it upon a very material point.

Instruction B, given for the plaintiff over the defendant's objection, was as follows:

"The court further instructs the jury that if they should believe from the evidence that, on the occasion when the said Robert Pence was killed in the collision with the said train, the servants, agents, and employees of the said officers and officials having the management and control of the said train, and of any cars which may have been standing on any of the said adjoining tracks, failed to exercise ordinary care under the circumstances to prevent the said train from coming into collision with the said automobile in which Robert Pence was traveling as he crossed the tracks of the said railroad, and that such failure to exercise ordinary care was the proximate cause of the death of the said Pence without any contributory negligence on his part, then they must find for the plaintiff."

This is less objectionable than instruction A, but, when read with the latter, its reference to the management and control of trains and cars which may have been standing on any of the adjoining tracks was not by any means sure to be regarded by the jury as merely descriptive of conditions at the crossing.

The giving of instruction C for the plaintiff was assigned as error, but no objection thereto has been pointed out, nor do we find that there is any error therein of which the defendant could justly complain. This instruction, as well as one or more given for the defendant, submitted to the jury the question of Pence's contributory negligence as favorably to the defendant as it had any right to ask.

Instruction H, given for the plaintiff, after very properly telling the jury that if Pence had no control or authority over Stillwell in the operation or management of the automobile at the time of the collision, the negligence of Stillwell could not be imputed to Pence, proceeded further and said: "And if the jury shall further believe from the evidence under the instructions of the court in this case that the officers and officials in charge of the said railroad \* \* \* failed to exercise ordinary care *in the operation and management of* the said passenger train or *any cars standing upon any adjoining track* of the said railroad, \* \* \* and if they shall further believe from the evidence that the said Robert Pence was himself guilty of no contributory negligence under the instructions of the court in this case, and that the proximate cause of death of the said Robert Pence under the circumstances was the failure on the part of the officers and officials in charge of the said railroad \* \* \* to exercise ordinary care as aforesaid, \* \* \* then they must find for the plaintiff." (Italics added.) This instruction thus repeats an error contained in A, and, in less degree, in B, as set out above.

[14] The errors in instructions A, B and H cannot be lightly regarded. This is a case in which the verdict for the plaintiff depended vitally upon conflicting testimony. In view of the instructions, it is impossible for us to say that the jury found for the plaintiff either upon the failure to give the requisite signals, or upon excessive speed—the only two grounds upon which there was sufficient evidence to support the verdict. As to these grounds, there was a conflict of evidence, and for aught we can say the jury may have found for the defendant in these particulars and yet held it liable because they believed there was negligence in leaving

the two cars standing near the crossing. If this is what they believed, they were led to find as they did because of the error contained in instructions A, B and H, and a grave injustice would be done to the defendant by allowing the verdict to stand.

[15] The doctrine of harmless error is favored by this court, and we do not interfere with a verdict when we can say that the case has been fairly tried upon its merits. *Standard Paint Co.* v. *Vietor & Co.*, 120 Va. 595, 610, 91 S. E. 752; *Va. Ry. & P. Co.* v. *Smith*, 129 Va. 269, 278, 105 S. E. 532. But we cannot apply that doctrine here without running a serious risk of requiring the defendant company to pay heavy damages in a case where upon correct instructions the jury might have found a contrary verdict.

The court refused to give instruction No. 8 asked for by the defendant, and this is assigned as error. The instruction was properly refused, because it placed both occupants of the car upon the same footing, and ignored the consideration that Pence was a passenger to whom the negligence of the driver could not properly be imputed.

Instruction No. 11, asked for by the defendant and refused, undertook to tell the jury as a matter of law that Stillwell and Pence were engaged in a joint enterprise, and was, therefore, properly refused.

[16] For the reasons indicated, the judgment complained of must be reversed, the verdict of the jury set aside, and the case remanded for a new trial. When it is tried again, however, it will not be necessary to go into the question of the measure of damages. We perceive no reason why the case should be retried upon this particular point. That question was fairly developed and there was no error assigned as to the instructions thereon, or as to the amount of the verdict.

In accordance with the provisions of section 6365 of the Code as applied by us in the case of *Director General of Railroads* v. *Garrett*, 131 Va. 125, 141, 108 S. E. 690, the order entered here will direct that the case shall not be restricted as to the amount of the damages, but that the court shall instruct the jury that if they find for the plaintiff, they shall say so and no more; and in that event the judgment shall be for the sum of $10,000.00, as fixed by the former verdict.

*Reversed and remanded for new trial.*