No. 620

First Circuit

## LAWRASON v. RICHARD

(June 9, 1930. Opinion and Decree.)
(June 30, 1930. Rehearing Refused.)
(August 7, 1930. Writs of Certiorari and Review Granted by Supreme Court.)
(May 26, 1931. Judgment of the Court of Appeal Affirmed.)

Daspit, Huckabay & Blanche, of Baton Rouge, attorneys for plaintiff, appellee.

Fred G. Benton, of Baton Rouge, C. W. Kernan, of Baton Rouge, Bond, Curtis & Hall, of New Orleans, and Porterie & Bordelon, of Marksville, attorneys for defendant, appellant.

ELLIOTT, J. An automobile belonging to, and while being driven by, Eugene Richard, Jr., and in which Sam Mathews Lawrason was riding, struck against the western end of the bridge which spans the Comite river on the Greenwell Springs road leading out of Baton Rouge, with the result that said Lawrason was badly injured. He claims of the defendant, Richard, the sum of $15,000 as damages on account of his said injuries. The plaintiff, Lawrason, alleges:

That he was riding in the car as the guest of said Richard. That the accident occurred at about 1 o'clock p. m. at night. That the night was dark and rainy, the road and bridge slippery.

That the collision was due to the excessive and reckless speed at which the defendant was driving under said conditions.

"That the crash of said automobile into the railing of said bridge and the resulting injuries to your petitioner were due to no fault, carelessness or negligence of your petitioner, but the same are and were due solely and entirely to the gross fault, carelessness and negligence of the defendant who was operating his car at a dangerous and excessive rate of speed, on a dark rainy night on a road with which he was not familiar."
"That defendant was careless and negligent in driving at a dangerous and excessive rate of speed on a dark and rainy night."
"That defendant was careless and negligent in failing to keep his car under control and in failing to drive it at a moderate rate of speed, so as to enable him to stop the car in an emergency."

There was judgment in the lower court in favor of plaintiff for $12,000. Defendant has appealed.

The judgment appealed from was signed on January 6, 1930. This appeal was taken January 7, 1930. When the appeal was called in this court on March 3, 1930, it was represented to the court by J. Wilton Jeansonne, that on January 17, 1930, the defendant, Richard, had been adjudged a bankrupt, and that he, said Jeansonne, having been elected trustee of the said

Richard in bankruptcy, had qualified as such, and should be substituted as defendant and appellant in the place of said Richard.

The showing appearing to be sufficient, and, no opposition having been made thereto, said Jeansonne was recognized as trustee of the estate of said Richard, and as such substituted as defendant and appellant in his place. The defendant, Richard, who is now represented by said trustee, urged several defenses.

Defendant admits that plaintiff was riding in his car, but contends that it was as a self-invited guest or guest by sufferance; that defendant did not willfully injure him, and is therefore not liable in damages.

Our examination of the evidence on this subject leads us to the conclusion that plaintiff was riding in the car as the guest of said Richard and at said Richard's invitation, tacitly or expressly given. And, having found that plaintiff was the guest of said Richard, the difference which exists on the subject of liability for negligence and recklessness in driving, when the party injured is a guest of the driver, or a self-invited guest, or a guest by sufferance, is not a question which requires consideration. For the reason stated, the authorities cited by defendant on that subject are not applicable to the situation.

Another defense is that the defendant Richard, was not familiar with the road; that the occupants of the car riding with him were familiar with it; that he therefore looked to them to warn him of danger; that he received no warning, except from Eddie Carriere, who merely said to him, "You had better be careful, this is bad," etc., which he took to have reference to a bad stretch of road.

Eddie Carriere testifies that he warned Richard that there was a bridge ahead, that he did not know where it was, but to slow down. He says that defendant did make an effort to slow down, but at that time the bridge was on them.

J. V. Sims says:

"Q. Did any one ask him not to drive so fast or was he warned in any way about driving fast?
"A. Yes, I warned him two or three times and Carriere, I think, warned him.
"Q. What did you warn him about?
"A. I just told him that the road was slippery or something to that effect, I don't remember the exact words,—that the road was slippery and he had better not go so fast; that it was dangerous.
"Q. You told him that?
"A. Yes."

Henry Rightor says:

"Q. Did you hear anybody warn him about driving too fast?
"A. Yes, I heard two people.
"Q. Who made that statement, Carriere and Sims? Do you know what Carriere said?
"A. I could not quote him, but I remember his telling him not to drive so fast, and warning him about a bridge being ahead.
"Q. About a bridge?
"A. Yes.
"Q. What did Sims say, if you know, not the exact language, but what the import of it was?
"A. He told him not to go so fast, that it was so wet that night he was liable to skid. I could not quote his words.
"Q. And you heard him warn him not to drive so fast?
"A. Yes."

Witness further says that he could not say at what point Carriere spoke of the bridge, but that the bridge was reached in a comparatively short time afterwards. Defendant, testifying on this subject, at one place says:

"Q. Do you know how far you were from the bridge when you started to slow down?

"A. Well, I should say probably 25 or 30 feet. That is my judgment, I don't know positively."

In another place he says:

"Q. It was testified by Mr. Carriere that he said that, and that you immediately made an effort to check the car. Is that correct?

"A. Yes.

"Q. Did you delay an instant after you received this warning, in making an attempt to bring your car to a stop?

"A. No."

Carriere had not said that Richard, upon being warned by him that there was a bridge ahead and to slow down, made an immediate effort to check his car. His testimony was that Richard made an effort to slow down, but that at the time he did so the bridge was on them. Just how long it was after the warning before the effort was made is a matter as to which the evidence does not say, but our inference from Carriere's statement is that the effort to slow down did not follow immediately after the warning; that Richard acted on the warning rather leisurely; that his compliance was somewhat tardy; and that, when he did act, the bridge was on them, and it was too late.

Defendant was driving 40 or 45 miles an hour. At 40 miles an hour the car went a mile in 90 seconds. Ninety seconds is a short space of time. If Richard, after getting within 150 feet of the curve, had made proper effort to slow down, he could have gotten his car under control sufficient to make the turn and enter the bridge with safety. We are satisfied that he was requested more than once by Sims to drive slower, warned that it was dangerous to drive so fast, and that he did not heed the warning.

It is our understanding that the Greenwell Springs road is a state highway. The Act 296 of 1928, sec. 4, prohibits driving upon a highway carelessly and heedlessly in willful or wanton disregard of the rights or safety of others, or without due caution and circumspection, and at a speed or in a manner so as to endanger any person or property, etc.

Section 5, paragraph (a), provides that:

"Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at such speed as to endanger the life, limb or property of any person.

"(b) . Subject to the provision (a) of this section and except in those instances where a lower speed is specified in this Act, it shall be prima facie lawful for the driver of a vehicle to drive at a speed not exceeding the following, but in any case when such speed would be unsafe it shall not be lawful."

The following rates are then specified:

"Fifteen miles an hour in traversing or going around curves * * * when the driver's view is obstructed within a distance of one hundred feet along such highway in the direction in which he is proceeding. * * *

"Forty-five miles an hour under all other conditions."

The evidence shows that, when the Greenwell Springs road reaches the Comite river, it turns in a short sharp curve to the left into the bridge which spans the river at that place. The bridge is only about half as wide as the road. This fact increases the danger; the sharp curve into the narrow bridge requiring automobiles

approaching from Baton Rouge to slow down so as to make the curve and enter the bridge safely. The evidence shows that it cannot be done in the daytime driving faster than 20 miles an hour. A witness living near by the bridge, and familiar with the place, says that one not familiar with the road cannot, in the nighttime, driving 20 miles an hour, make the curve and enter the bridge safely.

The speed would have been all right in the daytime under good weather conditions, provided Richard had slowed down and gotten his car under control as he neared the curve which turned into the bridge, but Richard was driving on a dark, rainy night on a road on which he had never driven before. It was raining at the time, and had been since the parties started on the trip. It is reasonable to suppose that the night was very dark, and, from the fact that it was raining, his windshield was likely dimmed, so that, though his headlights might have been burning brightly, yet his view ahead was obstructed so that it was not probable that he could see a sharp, abrupt curve, or any other low-lying object ahead, at a distance within which he could bring his car under control before reaching the place.

Under such conditions Richard's speed must be looked on as reckless and dangerous, to the extent that no man feeling or exercising any care for his own safety or that of the guests in his car would have driven that fast, in the absence of any reason requiring it. It was willfully rushing ahead without the power to control the movement. At the speed defendant, Richard, was driving, and under the conditions under which it was being done, he was willfully taking the chance that each moment might precipitate a disaster for himself and his guest. A man may do as he thinks proper with himself, but he has no right to thus deprive a guest in his power of the safety which reasonable caution and ordinary care ordinarily insures, and to which his guest is entitled. And such right is not lost because the guest remains in the car under the conditions in which the plaintiff was situated.

Another defense is that the defendant, Richard, was not familiar with the road and trusted to others, occupants of the car, who did know the road, to post him as to danger, etc.; that plaintiff was familiar with the road, but did not warn him nor protest the speed, etc.; that, if defendant was negligent, the plaintiff was guilty of contributory negligence, in that he did not warn defendant and protest the speed, etc.

Urging this defense, defendant says in his brief:

"Any one traversing the road, even one time, can not fail to be struck with the marked risk which is presented by the Comite River bridge. The pictures offered in evidence show beyond dispute that a wide straight road, suddenly terminates with a narrow bridge, one-half the width of the road and running at right angles to it, reach out across the river to the left.

"Knowing this trap, the plaintiff calmly permitted defendant, who knew nothing about it, to drive ahead at a speed easily suggestive of the very accident which followed. If this is not contributory negligence, then there is no such doctrine."

The evidence does not show that plaintiff was familiar with the road. He had been over the road and presumably the bridge in question on two former occasions. We may possibly assume that one of the previous occasions was when he was initiated into his fraternity about a year previous to the date of the present trip,

but as to when the other one was made we have no idea. And the weather conditions at the time of the previous trips do not appear. Two previous trips made at some time over the road was not enough to make plaintiff familiar with it, sufficiently to know when defendant's car was nearing the curve and bridge on the occasion in question.

His seat in the rumble, with the curtain which separated his seat from that which was occupied by the defendant buttoned down, made any communication between him and the defendant very difficult. In order for the plaintiff to have made himself heard by defendant while the car was going, it would have been necessary for him to speak loudly and raise his voice above the ordinary tone. The plaintiff could not see ahead through the curtain and darkness in the direction the car was going, so remained in his seat and said nothing to anybody in the front part of the car.

The evidence shows that plaintiff was not consulted about the driving, the speed, nor anything that the defendant was doing in so far as concerned the driving of the car.

The plaintiff had no control or authority over the car, nor over the defendant, nor as to defendant's manner and method of driving. The defendant, Richard, drove as he willed and saw proper. The fact that plaintiff made no request nor protest in such a situation cannot exonerate the defendant from responsibility because of his reckless disregard for prudence and care. The defendant cites many authorities in his brief as to the liability of a driver to his guest, engaged in making a trip of the kind, to which we have not access, except as read in his brief; but the

Louisiana cases which he cites, Toups v. Morgan's La. R. R. & S. S. Co., 4 La. App. 136; Roberts v. Eason, 6 La. App. 706; Ford v. Chicago, R. I. & P. R. Co., 8 La. App. 586, and Hutchens v. Morgan, 12 La. App. 545, 125 So. 309, are not based on situations like that which existed in the present case, and are therefore not controlling. He cites and quotes at length from Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L. R. A. 1917F, 253. In that case the court said (we quote from the syllabus):

"As a general rule, it is the duty of the driver of an automobile to maintain a speed sufficiently slow and to have such control of his car that he can stop within the distance in which he can plainly see an obstruction or danger ahead. But that rule does not apply to a case where a dangerous situation which the driver of the automobile had no reason to expect suddenly appeared immediately in front of the car. \
"A person driving on a public highway, especially in an incorporated city, has a right * * * to act upon the presumption that the way is safe for ordinary travel, even at night, and he is not required to be on the lookout for extraordinary dangers or obstructions to which his attention has not been called"—citing authorities.

Defendant argues that the open canal across the street, on which the defendant Jacobs was driving, a peril which he could not foresee, and the sharp curve in the Greenwell Springs road, turning into the narrow bridge which spans the Comite river, present the same legal situation; that defendant is not liable in damages for the same reason that Jacobs was held not liable. We find that the present situation is not the same that existed in the Jacobs case.

Banks' street on which Jacobs was driving is stated in the opinion to be one of the prominent thoroughfares in New Or-

leans. Jacobs had made inquiry as to the condition of the street before taking it, and 'was informed that it was all right. There was a way in which, if Jacobs had been familiar with the condition of the street at the time in question, he could, by careful driving, have passed around the place where he came to an open canal, but he did not see the way around, and, not being aware of the situation he followed the street, as he supposed he had a right to do. And he did have the right to suppose that a principal thoroughfare in New Orleans did not have an open canal across it into which he might precipitate himself before he could stop. The canal had been covered by a bridge, but the bridge had been taken up and the canal left open, without warning signs.

The court says in the course of the opinion:

"The preponderance of the evidence is, in our opinion, not that the speed was excessive, but to the contrary, that it was moderate."

The court also says, same opinion:

"* * * The evidence shows conclusively that the defendant could not have avoided running into the canal, although he was going at a moderate speed when he discovered the danger."

The presumption which favored Jacobs in the matter of the open canal on the street on which he was driving should not be made to apply to this curve in the Greenwell Springs road. A man should not drive on a country highway with which he is not familiar so fast, on a dark, rainy night, under conditions of such poor visibility that he cannot get his car under control so as to make a sharp curve. Danger from sharp curves on country highways must be kept in mind and guarded against by the driver, and it is inexcusable fault not to do so when there is a guest in the car whose safety is imperiled by it.

Then again in the Jacobs case it is inferable that the guest was seated on the front seat with the driver and had a full view ahead, just as the driver did. He was in a position in which he could see ahead and speak of any danger that appeared to require it. That was not the case with Lawrason; he occupied a rumble seat, from which he could not see ahead, nor could he speak to the driver, except with difficulty. Jacobs was not warned by his guest that there was danger ahead, nor requested to drive slower. Richard was warned by one guest on the front seat that there was a bridge ahead and to slow down. Another guest on the front seat warned him two or three times not to drive so fast—that it was dangerous. These warnings from the front seat were bound to have been heard by Richard. Carriere says that, when Richard did slow down, the bridge was on them. It is our understanding that Richard did not promptly heed the warnings, and, when he did start to slow down, it was too late.

The Jacobs case is on several important questions a supporting authority for the plaintiff. In the cases Timberlake v. Cassidy, 1 La. App. 630, and Brock v. Friend, 4 La. App. 720, we had before us situations similar to the present. In the two cases mentioned the guest had brought an action against the driver on account of injuries received by the guest due to the driver's reckless driving. In each case the court, by a majority opinion, held that the driving was reckless and that the driver was therefore responsible in damages to his guest.

In the case of Whipple v. Lirette, 11 La. App. 485, 124 So. 160, 164, we considered

a question of speed at night, and said, in a majority opinion on that subject:

"The latest authors say that when the driver of an automobile is blinded and cannot see objects in the road ahead of him, the speed of the car must be so slow that he can stop almost immediately."

Thus in Churchill v. R. Co., 151 La. 726, 92 So. 314, the action was by a guest, not against the party driving the car, as in the present case, but the court said in deciding:

"Where the failure on the part of the guest to see and protest a danger was urged, where the guest had no authority nor control over the car in which he was riding, he was not required to keep a lookout for danger, and could rely on the driver for the discharge of that duty."

Also in Daull v. New Orleans R. & Light Co., 147 La; 1012, 86 So. 477, 478. In that case the action was by a guest, but not against the party driving. There was contention that the guest did not keep a lookout, did not warn the driver of the danger, and was therefore negligent. The court said on rehearing:

"But Miss Cuneo was a guest in the automobile, not charged with its management, and therefore not participating in the negligence of the driver." Young v. Luria, 154 La. 919, 98 So. 419, is to the same effect.

The cases of Robinson v. Leonard, 100 Vt. 1, 134 A. 706; McAndrews v. Leonard, 99 Vt. 512, 134 A. 710; Munson v. Rupker, Ind. App. 148 N. E. 169; Id. (Ind. App.) 151 N. E: 101; Bennett v. Bell, 176 Ark. 690, 3 S. W. (2d) 996; Wilmes v. Fournier, 111 Misc. Rep. 9, 180, N. Y. 860, and Ryan v. Snyder, 29 Wyo. 146, 211 P. 482, furnished us by the plaintiff, in pamphlet form, supports his contention that a guest can recover from a negligent driver under facts similar in principle to the facts in the present case.

The defendant urges that he is not liable in this case because plaintiff and himself and the other parties with them were engaged at the time in a joint adventure, that all of the parties engaged in a joint adventure are agents and participants in whatever is done, and that no liability on account of a negligent act exists in favor of one against another.

A joint adventure is a species of partnership. Both must be based on an agreement of the parties. The difference is that a partnership is entered into for the purpose of business of a certain kind, and is to endure for all business of that kind until the parties determine otherwise, or until it is terminated as provided by law.

A joint adventure is an undertaking entered into for one purpose only.

In this case the parties who occupied the car in which plaintiff was riding and defendant was driving and a number of others had agreed to go on a trip for a certain purpose, and, in order to accomplish the journey from Baton Rouge to Magnolia, a place in the same parish, and return, they agreed to go in the cars of those who were present with cars. But, aside from this common purpose, none of the essentials of a joint adventure existed, as defined by the law.

In Jacobs v. Jacobs, heretofore cited, there must have been contention that the plaintiff and the defendant were engaged in a joint enterprise, because the court said in the course of the opinion, on page 286 of 141 La., 74 So. 992, 997:

"Nor do we hold that the plaintiff, by accepting the defendant's invitation to ride in the car, thereby engaged in a common enterprise or joint adventure with him in which neither would be liable to the other for an act of negligence."

The language of the court is in point.

Defendant cites us a large number of cases from other states, to which we have not access, save the statement in his brief. In a number of these cases it was apparently held that parties going on trips of business or pleasure could not recover damages from each other, on account of injuries received on the trip, as the result of the negligent act of some member of the party, on the ground that the parties were all engaged in a joint enterprise.

The plaintiff has on his part, in the same way, cited us a number in which it was held that parties engaged in a trip, something like that in which the plaintiff and defendant and their friends were engaged, were not a joint adventure, and that such trips do not come within the meaning of the law on that subject.

We have found and submit the following from Keiswetter v. Rubenstein, 235 Mich. 36, 209 N. W. 154, 48 A. L. R. 1049, note pages 1078 and 1080:

"In recent years there have been many attempts to charge passengers riding in conveyances of others, particularly passengers riding as guests of an automobile owner or driver, with the negligence of the driver, on the theory of a joint enterprise, but the courts have uniformly held that one merely a passenger cannot be deemed to be engaged in a joint enterprise with the driver for the purpose of imputing to him the negligence of the latter. Thus, there is no joint adventure between the driver of an automobile and one who is merely his guest, which will prevent the guest from recovering damages for injuries due to the driver's negligence. Jacobs v. Jacobs (1917) 141 La. 272, 74 So. 992, L. R. A. 1917F, 253; Loftus v. Pelletier (1916) 223 Mass. 63, 111 N. E. 712: Schwartz v. Johnson (1926) 152 Tenn. 586, 280 S. W. 32, 47 A. L. R. 323, 25 N. C. C. A. 692. See also Wilmes v. Fournier (1920) 111 Misc. Rep. 9, 180 N. Y. S. 860.

"So, a trained nurse hired and paid by a civic organization to attend needy patients when called upon to do so by a doctor in charge of such patient, who, in accordance with the common custom for the different doctors to take the nurse to the case when making calls, was riding with a doctor, at his request, to attend an out-of-town patient, cannot as a matter of law be said to be engaged in a common enterprise with the doctor so as to prevent recovery against him for an injury due to his negligent operation of the automobile. Loftus v. Pelletier (1916) 223 Mass. 63, 111 N. E. 712. * * *

"The doctrine of joint adventure as applied to the operation of a vehicle owned by one of its occupants ought to be restricted to cases where the common right to control its operation, as correlative with common responsibility for negligence for its operation, is either clearly apparent from the agreement of the parties, or is a logical conclusion from the facts. Coleman v. Bent (1924) 100 Conn. 527, 124 A. 224. * * *

"While it is somewhat difficult to state a comprehensive definition of what constitutes a joint enterprise, as applied to this class of cases, it is sufficiently accurate to say that, to impute a driver's negligence to an occupant of his vehicle, the relation must be shown to be something more than that of host and guest; the mere fact that they have both engaged in the drive because of mutual pleasure to be derived therefrom does not materially affect the situation. Withey v. Fowler Co. (1914) 164 Iowa, 377, 145 N. W. 923.

"It is not sufficient that the passenger indicates the route, or that both parties have certain plans in common, such as a 'joy ride'; the community of interest must be such that the passenger is entitled to be heard in the control and management of the vehicle—such as practically to amount to joint or common possession thereof (Pope v. Hapbern [1924] 193 Cal. 168, 223 P. 470; Bryant v. Pacific Electric R. Co. [1917] 174 Cal. 737, 164 P. 385); the common purpose of riding together for pleasure does not alone establish a joint enterprise (Barry v. Harding [1923] 244 Mass. 588, 139 N. E. 298, supra); there

must be something more to constitute a joint enterprise; the guest must be in a situation to assume the control of, or control in some manner, the means of locomotion (Lawrence v. Sioux City [1915] 172 Iowa, 320, 154 N. W. 494).

"The joint enterprise which will impute the contributory negligence of the driver of an automobile to one riding with him must invest the passenger with some voice in the control and direction of the vehicle, for, as the rule is founded on the doctrine of principal and agent, the passenger must be so related to the driver that the maxim 'qui facit per alium facit per se' is applicable. Director Gen. v. Pence [1923] 135 Va. 329, 116 S. E. 351.

"It must be shown that the occupant and driver together had such control over the automobile as practically to be in joint or common possession of it. Bryant v. Pacific Electric R. Co. [174 Cal. 737, 164 P. 385], supra.

"There should exist between the occupants a joint interest or a community of interest in the object of the enterprise, and an equal right to direct and control the conduct of each other with respect thereto. Cunningham v. Thief River Falls [1901] 84 Minn. 21, 86 N. W. 763, 10 Am. Neg. Rep. 106, followed in Adams v. Thief River Falls [1901] 84 Minn. 30, 86 N. W. 767, 10 Am. Neg. Rep. 113."

These authorities seem to be in line with the text-book writers on the subject. In this case there was no joint control of the car nor in its operation. Richard had absolute control, and drove it as he willed and liked. The plaintiff had no voice in the matter. In the situation under which he occupied a seat in the car, the trip was not a joint adventure. But, suppose the trip to have been such. Under our law, Civil Code, arts. 2315-2317, the evidence showing that plaintiff was in no way at fault, that his injury was due entirely to the fault, wrongful act, and imprudent driving of the defendant, Richard, the law obliges him to repair it.

The judgment appealed from is in our opinion correct.

Judgment affirmed.

## ON APPLICATION FOR REHEARING

The petition for rehearing contains the following statement:

"Upon its own statement of facts, the court is in error in concluding that the warning which was given by Eddie Carriere about a bridge being ahead, was given some time before the bridge was reached and under circumstances where defendant, if he had immediately heeded the warning, had an opportunity to avert the accident. Eddie Carriere, as stated by the court, clearly testified that he warned defendant and the defendant attempted to slow down, but that at the time the warning was given, the bridge was upon them and it was too late to avoid the accident. In respect to this matter, Eddie Carriere testified on page 15 of the note of evidence as follows:

"Q. You say just before you reached the bridge, you warned him, that at that time you were right on the bridge?

"A. I did not say that. I said I warned him and as soon as I warned him, he made efforts to slow down, but at that time the bridge was on us."

The answer to the question referred to was as follows (note testimony, pp. 10 and 11):

"Q. Just before the automobile reached the bridge, about how fast in your judgment was it going?

"A. Just before we reached the bridge I warned Mr. Richard that there was a bridge ahead, that I didn't know where it was, but that there was a bridge ahead and to slow down. Mr. Richard did make an effort to slow down but at that time the bridge was on us."

The answer previously given was that just before the bridge was reached Carriere warned Richard that there was a bridge ahead; that he (Carriere) did not know where it was, but that there was

one ahead and to slow down; that Mr. Richard did make an effort to slow down, but at that time the bridge was on them.

Mr. Carriere, after making the statement quoted by defendant, was further questioned (note testimony, pp. 15 and 16):

"Q. How much did he slow down, between that point and the point where he struck the bridge?
"A. I couldn't tell. There wasn't any speedometer. That would be pretty hard.
"Q. Right from the time you warned him did he make an effort to slow down?
"A. When I warned him, he made an effort to slow down.
"Q. He did make an effort to slow down?
"A. I wasn't watching him, but I imagine he must have taken his foot off the accelerator."

On page 18 the witness further said:

"Q. During the course of this trip, did you say anything about the speed?
"A. The only time I mentioned the speed was when I told him to slow down, that I knew a bridge was coming, but I did not know where it was."

The statement, "I wasn't watching him, I imagine he must have taken his foot off the accelerator," together with the other expressions of the witness and his first answer which we have quoted, tends to indicate his meaning that the slowing down was tardy and not prompt as by applying the brakes. The impression that Richard took his foot off the accelerator indicates that the car went on under its momentum without application of the brakes. At the speed it was going its momentum kept up a speed which from that at which it was running commenced to slacken, but not sufficient for the exigency of the sharp turn into the bridge on a dark and rainy night. Further consideration has not changed our views. Our conclusion was correct.