𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, V.
JULIA MAE GARRETT.

September 22, 1921.

1. CARRIERS—*Relationship of Carrier and Passenger—Duration of the Relationship.*—The relationship and liability of a carrier to a passenger, having once commenced, will ordinarily continue, until the passenger has reached his destination; but such relationship and liability may be terminated at some other point by the passenger's voluntary departure from the carrier's vehicle.

2. CARRIERS—*Duty to Stop at Station to Which Passenger Holds Ticket—Duty to Return to Station.*—When a passenger holds a ticket for a particular station, the general rule is well settled that the train must be stopped at that station and a reasonable opportunity given the passenger to disembark. If it does not stop and the passenger is carried beyond his destination, then it is the duty of the carrier to return him to the station to which he holds a ticket. This does not mean, however, that in all cases the carrier is bound to run the train back to the station; that, of course, will depend upon circumstances, including in particular the question as to how far the train has gone beyond the passenger's destination before the mistake is discovered.

3. CARRIERS—*Duty to Stop at Station to Which Passenger Holds Ticket—Duty to Return to Station—Burden of Proof.*—The duty of the carrier to return the passenger a reasonable distance to his point of destination beyond which he has been carried will not be excused because it is inconvenient or troublesome, but only upon the proof of some controlling exigency, and the burden of such proof is upon the carrier the moment the passenger proves that he has the right of passage to a certain point and a compliance on his part with ordinary care, and that such point of destination was passed by the carrier without giving the passenger an opportunty of getting off.

4. CARRIERS—*Duty to Stop at Station to Which Passenger Holds Ticket—Duty to Return to Station—Termination of Relationship of Carrier and Passenger.*—But if it would be imprudent or unsafe, or a manifest inconvenience to other passengers, by

reason of the distance beyond the station to which the train has proceeded before the mistake is discovered, to back to the station, the carrier may allow the passenger to get off if he requests to do so, or, if the passenger prefers, carry him on to the next station and return him, free of charge, by next train, to the station to which he held a ticket. In either event the passenger would have a right of action against the carrier, and could recover such damages as naturally and proximately resulted from its default in carrying him by his station. But should the passenger elect to leave the train by his voluntary departure from the train at another point than that of his destination, the relationship of carrier and passenger would be terminated, and the question of damages might be very materially affected.

5. CARRIERS—*Duty to Stop at Station to Which Passenger Holds Ticket—Duty to Return to Station—Rule of Carrier.*—In the instant case, the train had proceeded nearly a mile beyond the station to which the passenger had a ticket. There was a reasonable rule of the company that "no movement must be made against the current of traffic without orders from the superintendent of transportation."

*Held:* That notwithstanding this rule, there was evidence in the instant case upon which the jury might have found that upon a reasonable interpretation and application of the rule the conductor would not have violated it nor caused the other passengers any risk or disproportionate inconvenience if the train had been backed to the station of the passenger's destination.

6. CARRIERS OF PASSENGERS—*Carrying Beyond Station—Passenger Alighting to Return to Station—Relationship of Carrier and Passenger.*—In the instant case, there was a view of the evidence under which the passenger might have been regarded as having been coerced or unduly induced to take the course which she did in leaving the train when she had been carried for some distance beyond her station, and if such was the case, the passenger certainly could not be held, as a matter of law, to have forfeited her relationship as a passenger.

7. CARRIERS OF PASSENGERS—*Carrying Beyond Station—Passenger Alighting to Return to Station—Relationship of Carrier and Passenger—Question for Jury.*—There was evidence which would have warranted the jury in finding that a passenger in leaving the train after it had passed her station did voluntarily and deliberately give up her rights as a passenger, and voluntarily terminated the relationship of carrier and passenger. On the other hand, there was evidence under which the passenger might be regarded as having been coerced or unduly induced to take the course which she did in leaving the train. Plantiff's

instructions did not adequately submit this question of whether the passenger voluntarily left the train to the jury, and those asked for by the defendant on the subject were rejected.

*Held:* Error.

8. CARRIERS OF PASSENGERS—*Carrying Beyond Station—Passenger Returning to Station on Foot—Termination of Relationship of Carrier and Passenger—Case at Bar.*—Where a passenger, an intelligent young woman, accustomed to riding on trains, although she had not attained her majority, upon being carried past her station by mistake, of her own free will and deliberate judgment, unhampered by any inproper conduct on the part of the conductor, left the train rather than incur the inconvenience of being carried on and return by another train, then the passenger by such conduct terminated her repationship as a passenger and assumed the risk of the consequences which might befall her.

9. CARRIERS OF PASSENGERS—*Passenger Put Off the Train Beyond Her Destination—Liability of Carrier for Assault—Proximate and Remote Cause.*—If a passenger, a young girl, is carried about a mile beyond her destination and is coerced or improperly induced to leave the train and return by foot at a point which bore the reputation of being a dangerous resort of tramps, and is there assaulted by unknown persons, the jury might properly find that the assaults to which she was subjected were proximately caused by her wrongful ejection from the train, and that the carrier was liable therefor.

10. NEGLIGENCE—*Proximate Cause—"Foreseeableness."*—The "foreseeableness," or reasonable anticipation of the consequences of a wrongful or negligent act is not the measure of liability of the guilty party, though it may be determinative of the question of his negligence. When once it has been determined that the act is wrongful or negligent, the guilty party is liable for all the consequences which naturally flow therefrom, whether they were reasonably to have been anticipated or not, and in determining whether or not the consequences do naturally flow from the wrongful act or neglect, the case should be viewed retrospectively; that is to say, looking at the consequences, were they so improbable or unlikely to occur that it would not be fair and just to charge a reasonably prudent man with them. If not, he is liable. This is the test of liability, but when liability has been established, its extent is to be measured by the natural consequences of the negligent or wrongful act. The precise injury need not have been anticipated. It is enough if the act is such that the party ought to have anticipated that it was liable to result in injury to others.

11. CARRIERS—*Carriers of Passengers—Degree of Care Required of Carrier.*—The care which a carrier owes a passenger is not merely ordinary care and prudence, but the highest degree of care which can be expected from human foresight.

12. CARRIERS—*Passenger Carried Beyond Station—Duty of Carrier to Know Character of Place at Which Passenger is Put Down.*— A carrier, in the discharge of the very high duty which it owes to its passengers, is bound to know the character of the place at which it wrongfully discharges them; and if the carrier wrongfully requires a passenger to get off at a dangerous place without knowing it, it does so at its peril.

13. PROXIMATE AND REMOTE CAUSE—*Independent Act of Third Person —Negligently Exposing Injured Party to Act Causing Injury.*— While in general no responsibility for a wrong attaches where an independent act of a third person intervenes between the negligence complained of and the injury, yet this proposition does not apply where the very negligence alleged consists of exposing the injured party to the act causing the injury, as in the instant case the exposure of a passenger to an assault by the wrongful act of the carrier in causing her to alight at a dangerout place when carried beyond her destination.

14.—CARRIERS—*Liability for Assault—Duty of Carrier.*—Wherever a carrier has reason to anticipate the danger of an assault upon one of its passengers, it rests under the duty of protecting such passenger against the same.

15. APPEAL AND ERROR—*Remand for New Trial Upon One Point Only —Section 6365 of the Code of 1919.*—Where in an action by a passenger against a carrier for injury from assault the parties have had a fair trial upon all questions, including the amount of damages, except the question of whether the plaintiff exercised a free and voluntary choice in leaving the train after being carried beyond her station, the Supreme Court of Appeals remanded the cause solely for the determination of that one question pursuant to section 6365 of the Code of 1919, which provides that, "a civil case shall not be remanded for a trial *de novo,* except when the ends of justice require it, but the appellate court shall, in the order remanding the case, if it be remanded, designate upon what questions or points a new trial is to be had."

Error to a judgment of the Circuit Court of Fairfax county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Barbour, Keith, McCandlish & Garnett*, for the plaintiff in error.

*C. V. Ford* and *Wilson M. Farr*, for the defendant in error.

KELLY, P., delivered the opinion of the court.

The plaintiff is a young girl, between eighteen and nineteen years of age, and the object of the suit is to hold the defendant, director general of railroads, liable in damages for two acts of rape upon her person, committed by two men shortly after she had been, as she alleges, negligently required to leave the defendant's train in a dangerous and unprotected place.

The evidence was in some material respects conflicting, but substantially the following facts were either conclusively established or supported by evidence which would have justified the jury in accepting them as true. The occurrences complained of transpired in daylight, but very shortly before dark, on the 2nd day of February, 1919. The plaintiff was a passenger on the defendant's train and held a ticket from the city of Washington, D. C., to a station called Seminary, in Fairfax county. The train failed to stop at Seminary, and thereupon another passenger, one W. L. Garnett, who also held a ticket for that station, called the attention of a flagman to the fact that he had bought a ticket for that place and wanted to get off. The train was then stopped, and Garnett alighted and walked by a near way to his home. About that time the plaintiff told the conductor she had a ticket to Seminary, and she was about to get off, but he directed her to wait, as he intended to back the train to the station. This occurrence took place

9

about seven-tenths of a mile beyond Seminary. She did step back, but the train, instead of moving backward, pulled ahead, and she asked the conductor what he intended to do, saying she thought he was going back to the station. He then said that he could not go back because he was afraid he would run into another train, and that she would, therefore, have to go on through and be sent back to Seminary on the next train, or else get off at that point. She testified that the conductor's manner was very rough, and that he seemed indifferent to what happened to her; and it is fairly inferable from the evidence (if his testimony in conflict be rejected) that she understood him to mean that if she did not get off at that point he would carry her on all the way through to Richmond before starting her on the return journey, which would involve a long trip in the night and much discomfort and inconvenience. Thereupon, she said to him: "Let me off," and he stopped the train and she left the car. About the same time, a man wearing a United States army uniform, generally referred to in the record as a soldier, got off the train on the opposite side. The plaintiff started back in the direction of Seminary, walking alongside the track. The soldier followed, and shortly overtook her, taking hold of her arm and asking if he might accompany her home. She denied this request, and he thereupon forcibly carried her across the track and down a high embankment to an obscure spot, where he pushed her to the ground and ravished her. After accomplishing his fiendish purpose, he left her, and has never been identified. Within a few moments thereafter, and while she was still trying to arise from the ground, a man dressed in citizen's clothes, described by her as a civilian, appeared and ravished her the second time. He likewise disappeared, and has never been identified. A vigilant and extensive search for the assailants was made, but without success. After both of these horrible occurrences, she struggled to her feet,

came back to the surface of the railroad grade, and was then met by two citiezns living in the neighborhood, who escorted her to her home. One of these parties, a Mr. Cockrell, had, from his home a few hundred yards away, seen the plaintiff leave the train, with the soldier following. His attention was diverted, and he did not see them leave the railroad grade, but a few minutes later saw that they had disappeared. This fact aroused his suspicion, and he called a companion and they set out to see what had become of the young woman. They testified that when they met her she was in a most pitiable condition—her clothing soiled and disarranged, her mouth bleeding, her face dirty, and her mental condition plainly evidencing that she had been subjected to some horrible treatment. Her mother testified that, upon an examination of her person, she found that the plaintiff had been subjected to physical violence, and that there were convincing evidences that she "had been misused." A physician who was called and examined her next day was summoned as a witness in her behalf and was in attendance at the beginning of the trial, but did not testify because, before a convenient and orderly point for his testimony had been reached, he was called away by professional duties, and plaintiff's counsel deemed it unnecessary to require him to come back.

There is no direct claim made before us that the plaintiff fabricated in whole or in part the story upon which she brings this suit, but there seems to be an implied contention to this effect. The questions involving her integrity and veracity and the probable truthfulness of her narrative, however, if indeed such questions are intended to be presented to us, were peculiarly questions for the jury; and we must now treat that narrative as true. And it is proper to add that upon a critical examination of the record we do not think her story is seriously discredited. Her character for chastity and for truth and veracity is not im-

pugned or discredited by anything which appears in the record; and her account of the alleged outrages was so fully accredited in the community where she lived that earnest and prolonged, though futile, efforts were made to locate and arrest her assailants.

The point at which the plaintiff left the train was about four-fifths of a mile from the flag-station known as Seminary, and there was abundant evidence to show that on the right-hand side of the railroad track, leading back from that point to Seminary, there was a ravine or depression, locally known as "Hoboes' Hollow," "Tramps' Hollow," and "Tramps' Den," which was then, and had been for at least a year (during the whole of the regime of the director general of railroads), habitually frequented and infested by hoboes, tramps and questionable characters. The attractiveness of the place for such characters is fully explained in the record.

There was a verdict and judgment for the plaintiff, and the defendant brings the case here for review.

There were twelve general assignments of error, and the actual number was materially larger, owing to the fact that two of the assignments dealt more or less particularly with each of the unnecessarily numerous instructions involved, but we think the merits of the case and the substantial differences between the parties may be reduced to two questions: (1) Was the plaintiff ejected from the defendant's train under such circumstances as to entitle her to claim the relationship of a passenger until she had returned to Seminary station, the point to which she held a ticket; (2) if so, can the assaults to which she was subjected be regarded as proximately caused by such wrongful ejection from the train?

1. It is contended that the plaintiff is not entitled to recover because she had voluntarily terminated her relationship as a passenger by accepting the alternative which the

conductor offered her and leaving the train. This defense is good if the proposition upon which it rests is supported by the facts.

A brief discussion of the principles of law applicable in this connection will be helpful in reaching a correct answer to the question now under consideration.

[1] The relationship and liability of a carrier to a passenger, having once commenced, will ordinarily continue until the passenger has reached his destination; but such relationship and liability may be terminated at some other point by the passenger's voluntary departure from the carrier's vehicle. 4 R. C. L., sec. 499, p. 1048; 6 Cyc. 541; 10 C. J. 628; 5 Am. & Eng. Ency. L. (2nd ed.), pp. 497, 500; *Commonwealth* v. *Boston & M. R. Co.*, 129 Mass. 500, 37 Am. Rep. 382.

[2] When a passenger holds a ticket for a particular station, the general rule is well settled that the train must be stopped at that station and a reasonable opportunity given the passenger to disembark. If it does not stop and the passenger is carried beyond his destination, then it is the duty of the carrier to return him to the station to which he holds a ticket. This does not mean, however, that in all cases the carrier is bound to run the train back to the station; that, of course, will depend upon circumstances, including in particular the question as to how far the train has gone beyond the passenger's destination before the mistake is discovered.

[3] In *Samuels* v. *Richmond, etc., R. R. Co.*, 35 S. C. 493, 14 S. E. 943, 28 Am. St. Rep. 883, 888, a case in which a female passenger had been carried perhaps four hundred yards beyond the destination called for in her ticket and then rudely ejected at a damp and rough place, the court, in dealing with the general duty of the carrier under such circumstances, said: "If the carrier can with safety discharge his passenger at the point of destination, such pas-

senger has the right to such action; and if from any cause
and in a reasonable distance from such station that has
been passed without the passenger having been afforded an
opportunity to alight at his destination, such action is dis-
covered, it is the duty of the carrier to return such passen-
ger to that destination. It will not be excused because it
is inconvenient or troublesome; it will only be excused upon
the proof of some controlling exigency, and the burden of
such proof is upon the carrier the moment the passenger
proves that he had the right of passage to a certain point
and a compliance on his part with ordinary care, and that
such point of destination was passed by the carrier without
giving the passenger an opportunity of getting off."

[4] The general rule as stated in the above quotation is
undoubtedly sound and just, and is fully supported by au-
thority and by common sense and justice; but it must be
remembered that the passanger who has been carried be-
yond his destination is not the sole person to be considered.
See *Yazoo & M. V. R. Co.* v. *Hardie*, 100 Miss. 132, 55 So.
42, 967, 34 L. R. A. (N. S.) 740, 742, Ann. Cas. 1914-A, 323.
If it would be imprudent or unsafe, or a manifest incon-
venience to other passengers, by reason of the distance be-
yond the station to which the train had proceeded before
the mistake was discovered, to back to the station, the only
alternative left, with a due regard to the safety and rights
of other passengers and a proper consideration for an ef-
ficient public service, is to allow the passenger to get off,
if he requests to do so, or, if he prefers, carry him on to
the next station and return him, free of charge, by next
train, to the station to which he held a ticket. In such case,
whether the passenger elects to leave the train and return
on foot or by other means to his destination, or to accept
the other alternative suggested, he would have a right of
action against the carrier, and could recover such damages
as naturally and proximately resulted from its default in

carrying him by his station. By a voluntary departure from the train at some other than the point of destination, the relationship would be terminated, and the question of damages might very materially be affected.

[5] In the instant case, the train had proceeded nearly a mile beyond the station. There was a rule of the company, as disclosed by the evidence, which in itself was a reasonable rule, to the following effect: "On a double track (as in this case), no movement must be made against the current of traffic without orders from the superintendent of transportation." But there was also evidence upon which the jury might properly have found that under a reasonable interpretation and application of this rule the conductor would not have violated it nor caused the other passengers any risk or disproportionate inconvenience if the train had been backed to Seminary. No scheduled train was to follow soon, and under the block system in effect upon that road, if any train followed it could only enter the block under caution.

[6-8] Furthermore, the evidence was such as that reasonable men might have differed as to whether the plaintiff could be said to have voluntarily left the train at the point in question. She was suddenly placed in a perplexing situation. She says the conductor treated her rudely, and made no explanation as to what he meant by carrying her through and sending her back, and there is room to contend that she did not, in legal contemplation, voluntarily sever her relationship as a passenger by leaving the train under these exciting and embarrassing circumstances. In other words, there is a view of the evidence under which she might be regarded as having been coerced or unduly induced to take the course which she did in leaving the car. In such a case, she certainly could not be held, as a matter of law, to have forfeited her relationship as a passenger. *Stevens* v. *Kansas City Elevated Ry. Co.*, 126 Mo. App. 619; 105 S. W. 26.

On the other hand, the testimony of the conductor and other witnesses on behalf of the defendant, if taken alone and accepted at its face value, would have warranted the jury in finding that she did voluntarily and deliberately give up her rights as a passenger and voluntarily terminate the relationship. The question thus became one which should have been submitted to the jury on proper instructions.

The plaintiff's instructions did not, in our opinion, adequately submit this question to the jury, and those asked for by the defendant on that subject were rejected. This was error. We shall not discuss the instructions in detail. What we have said will be a sufficient guide for the trial court in formulating instructions when the case comes to trial again. It only remains to say that if the jury should find that the plaintiff did exercise a free will and deliberate judgment, unhampered by any improper conduct on the part of the conductor, and decided to leave the train rather than incur the inconvenience of taking the other course, then she did terminate her relationship as a passenger and assumed the risk of the consequences which befell her. She had not attained her majority, but she was an intelligent young woman, in business for herself, accustomed to riding on trains, and legally competent to make a deliberate choice.

[9] 2. Coming now to the second question, and assuming in this discussion that the plaintiff did not, in legal contemplation, voluntarily leave the train and thus end the relationship of carrier and passenger between her and the defendant, could the jury, under the evidence as to the character of the place, have been permitted to find that the assaults to which she was subjected were proximately caused by her wrongful ejection from the train?

With this question we have no difficulty; it is clearly to be answered in the affirmative.

[10] In the case of *N. & W. Ry. Co.* v. *Whitehurst*, 125 Va. 260, 263, 99 S. E. 568, 569, Judge Burks, delivering the opinion of this court, said: "The 'foreseeableness,' or reasonable anticipation of the consequences of a wrongful or negligent act is not the measure of liability of the guilty party, though it may be determinative of the question of his negligence. When once it has been determined that the act is wrongful or negligent, the guilty party is liable for all the consequences which naturally flow therefrom, whether they were reasonably to have been anticipated or not, and in determining whether or not the consequences do naturally flow from the wrongful act or neglect, the case should be viewed retrospectively; that is to say, looking at the consequences, were they so improbable or unlikely to occur that it would not be fair and just to charge a reasonably prudent man with them. If not, he is liable. This is the test of liability, but when liability has been established, its extent is to be measured by the natural consequences of the negligent or wrongful act. The precise injury need not have been anticipated. It is enough if the act is such that the party ought to have anticipated that it was liable to result in injury to others. *City Gas Co.* v. *Webb*, 117 Va. 269, 84 S. E. 645; *Pulaski Gaslight Co.* v. *McClintock*, 97 Ark. 576, 134 S. W. 1189, 1199, 32 L. R. A. (N. S.) 825; Cooley on Torts (Student's Ed.), p. 33; *Hill* v. *Winsor*, 118 Mass. 251; 25 Harvard Law Review, 245-6; 1 Shear. & Red. (5th ed.), sec. 28, and cases cited." See also to same effect, *Tripp* v. *City of Norfolk*, 129 Va. 566, 106 S. E. 360; *Judy* v. *Doyle*, 130 Va. 392, 108 S. E. 6.

[11] Applying the rule above quoted, bearing in mind the high degree of care due by a carrier to its passengers, and assuming that the plaintiff did not voluntarily leave the train, but was coerced or persuaded to do so at an improper and dangerous place, the case, to say the least of it, was clearly one in which the jury might have properly found

in her favor. It requires no resort to a retrospective view of the facts to reach this conclusion. The consequences which overtook this young woman were sufficiently probable to charge any responsible party with the duty of guarding against them. No eighteen-year-old girl should be required to set out alone, near nightfall, to walk along an unprotected route, passing a spot which is physically so situated as to lend itself to the perpetration of a criminal assault, and which is infested by worthless, irresponsible and questionable characters known as tramps and hoboes; and no prudent man, charged with her care, would willingly cause her to do so. The very danger to which this unfortunate girl fell a victim is the one which would at once suggest itself to the average and normal mind as a danger liable to overtake her under these circumstances. It is no answer to the proposition to say that the presumption is that crimes of this character will not be committed. The presumption applies under ordinary circumstances, but it is not to be indulged, and ordinarily prudent men do not indulge it, to the extent of regarding it safe to expose a young woman to such a risk as the plaintiff in this case incurred in passing "Hobo Hollow" as the shades of night were approaching. The fact that there were numerous houses within a few hundred yards of the place does not relieve the situation, if the jury believed, as it might have done, that the place itself was dangerous and unprotected. And when it is recalled that the care which the carrier owed to her, assuming that she was still a passenger, was not merely ordinary care and prudence, but the highest degree of care which could be expected from human foresight, it is clear that there was a view of the evidence under which the defendant was liable for the injuries which she sustained as having been proximately caused by its breach of duty.

[12] There is a suggestion that the evidence does not

show that the defendant in this case knew of the dangerous character of the vicinity through which the plaintiff would have to walk in order to reach her destination. In view of the evidence, it is difficult to see how the defendant could have failed to know the general reputation of this place. But it was not incumbent upon the plaintiff to show such knowledge. A carrier, in the discharge of the very high duty which it owes to its passengers, is bound to know the character of the place at which it wrongfully discharges them; and if the defendant wrongfully required the plaintiff to get off at a dangerous place without knowing it, it did so at its peril.

Nor can it be said that the plaintiff assumed the risk of the danger. That depended upon whether she acted deliberately and voluntarily; and, under the present branch of the case we are assuming, that which the jury might under proper instructions have found, that she was in effect ejected from the train by having to act hastily and without reasonable opportunity for thought or deliberation in an emergency which was wrongfully brought about and improperly dealt with by the defendant.

[13, 14] The chief defense under this branch of the case seems to be based upon the proposition that even if the plaintiff was negligently required to leave the train, the assaults upon her cannot be regarded as the proximate result of that negligence, because they resulted from an independent act of third persons over whom the defendant had no control and with whom it had no relation. Numerous authorities are cited in support of this proposition. We shall content ourselves, in the main, by saying that only a few of the cases relied upon appear to us difficult of substantial distinction from the present case, and that to such as are in conflict with the views herein expressed we are unable to give our approval. A case very strongly relied upon by the defendant in this connection is that of *The*

*Lusitania* (D. C.), 251 Fed. 715, 732. In that case the opinion by the district judge was devoted principally to the consideration of the question of negligence, and after a very full and careful review of all the evidence, the conclusion was reached that there was no negligence shown, and that, therefore, the claimants were not entitled to recover. After having reached this conclusion, the opinion proceeds to say that even if the evidence had established negligence, there could have been no rcovery because the destruction of the vessel resulted from an independent illegal act, and could not be regarded as the proximate result of such negligence. This latter proposition may, therefore, very properly be regarded as a *dictum* in the *Lusitania Case,* but whether so or not, we cannot give our assent to it as applied to the case in hand.

We do not wish to be understood as questioning the general proposition that no responsibility for a wrong attaches whenever an independent act of a third person intervenes between the negligence complained of and the injury. But, as pointed out by Judge Keith in *Connell* v. *C. & O. Ry. Co.,* 93 Va. 57, 24 S. E. 467, 32 L. R. A. 792, 57 Am. St. Rep. 786, this proposition does not apply where the very negligence alleged consists of exposing the injured party to the act causing the injury. It is perfectly well settled and will not be seriously denied that wherever a carrier has reason to anticipate the danger of an assault upon one of its passengers, it rests under the duty of protecting such passenger against the same.

The Virginia cases relied upon by the defendant do not sustain its position. Neither in the case of *Connell* v. *C. & O. Ry. Co., supra,* nor in *Fowlkes* v. *Southern Ry. Co.,* 96 Va. 742, 32 S. E. 464, could the defendant have been reasonably expected to anticipate the consequences for which the plaintiff sought to recover. Those cases applied the same rule which we have applied in this case, and held that

the proximate result of negligence is a result which ought to have been foreseen in the light of attending circumstances.

Upon this branch of the case, there was no error in the instructions, or otherwise, to the prejudice of the defendant, and we think, therefore, that the plaintiff should recover the amount of the damages fixed by the verdict of the jury, unless at another trial a jury, upon instructions in accordance with the views hereinbefore expressed, should find for the defendant upon the question as to whether the plaintiff exercised a free and voluntary choice in leaving the train. If they should so find, there should be a final judgment for the defendant. Upon all other questions, including the amount of damage, the parties have had a fair trial, and we shall, therefore, remand the cause solely for the determination of the one question indicated. This course is taken pursuant to Section 6365 of the Code of 1919, which provides that "a civil case shall not be remanded for a trial *de novo,* except when the ends of justice require it, but the appellate court shall, in the order remanding the case, if it be remanded, designate upon what questions or points a new trial is to be had."

*Reversed.*