Agnes Neering, Appellee, v. Illinois Central Railroad Company, Appellant.

Gen. No. 41,999.

HEBEL, J., dissenting.

Heard in the third division of this court for the first district at the October term, 1941. Opinion filed July 3, 1942. Rehearing denied September 18, 1942.

JOHN W. FREELS and HERBERT J. DEANY, both of Chicago, for appellant; EDWARD C. CRAIG, VERNON W. FOSTER and CHARLES A. HELSELL, all of Chicago, of counsel.

RINGER, REINWALD & SOSTRIN, of Chicago, for appellee; M. LESTER REINWALD and MORRIS SOSTRIN, both of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

In a complaint filed in the circuit court of Cook county Agnes Neering asked for damages because of injuries suffered on September 6, 1938, as a result of being assaulted, beaten, raped and robbed while she was awaiting the arrival of a suburban train at the Riverdale Station of the Illinois Central Railroad. A trial before the court and a jury resulted in a verdict in her favor for $5,000. The court overruled defendant's motion for a judgment notwithstanding the verdict and for a new trial, and entered judgment on the verdict, to reverse which this appeal is prosecuted.

Agnes Neering, 23 years of age, lived at Riverdale, Illinois, and for several years prior to September 6,

1938, had been employed as a waitress at Harvey, about three miles south of Riverdale. She used the defendant's suburban service to go to her work, and for several years she had regularly taken a south-bound train from the Riverdale Station at 4:59 a.m. The regular employees on this train knew her as a daily passenger, and on occasion held the train for her when she was late. Riverdale is a village of 3,200 inhabitants, adjoined on the north and east by the City of Chicago. The village extends from 130th street on the north to 146th street on the south, and Indiana avenue is its eastern boundary. The main north and south line of the defendant passed through Riverdale on an elevated embankment built by the railroad. This embankment was an earth and cinder fill about 18 feet high. On top of the embankment were 6 sets of tracks, the 2 most westerly being for electric suburban service, and the 4 on the east side carrying passenger and freight trains. In September 1938, 82 suburban trains stopped every 24 hours at the Riverdale Station, and 68 freight and passenger trains passed there on the main line, or 150 trains daily of all types. This main line from Chicago to New Orleans passed through several southern States. The defendant had two stations for suburban service in Riverdale. The main one was between 137th and 138th streets, with entrances from each street, and was called the Riverdale Station. The other was a half mile further south and had an entrance only from 144th street. The latter station was known as the Ivanhoe Station. The main line between 130th and 146th Streets was wholly within the limits of the village of Riverdale, and both stations were within the police jurisdiction of that village. The main business and residential part of the village was east of the Riverdale Station. Illinois street lay just at the east edge of the railroad embankment. There was a school at 137th and Illinois streets. Homes on

Illinois street nearer 138th street faced the embankment. On the west side of the embankment the entire space between 137th and 138th streets was taken up by a park or playground which extended to Wentworth avenue. West of the park lay large open areas and vacant ground and prairie. Both 137th and 138th streets pass under the railroad embankment through concrete subways, each about 200 feet in length. Stairs from each subway lead up to a passenger platform constructed between the two sets of suburban tracks. Where they reached the level of the elevated roadbed, these stairs were covered by a canopy. The platform between the two canopies was about 600 feet in length. At the south end it was level with the track for 138 feet, during which distance there were railings 3 feet high of iron pipe on each side. Then came 5 steps which led up to the main platform referred to as the "high platform." This was about 450 feet in length and 15 feet in width. This platform was 4 feet 8 inches above the surface of the roadbed, being at the same level as the floor of the trains which stopped alongside the platform. The north end of the high platform was roofed. A small ticket office was at the top of the stairs leading from 137th street. Then came a 16 foot space open at the sides, but roofed. South of this space was a warming house 48 feet in length containing benches and a stove. This warming house occupied only the center of the platform, leaving a ledge about 3 feet wide on each side. It was glassed in on all sides, the glass in the doors and windows being about 2 or 3 feet above the floor. The south end of the warming house was a little over 500 feet north of the steps leading from 138th street. Between the warming house and these steps were 2 windbreaks, roofed partitions, built in the center of the platform so that people could stand on either side and be protected from the wind or rain. The most northerly of these windbreaks also contained benches. Out-

side of the lights in the warming house itself, there were 24 lights on the high platform, and 4 of these lights were over the ledge on each side of the warming house. Others were in each of the windbreaks and at other points on the platform. There were also 3 high lights over the walkway between the high platform and 138th street. The lights on these poles were 100 watt. There were also lights on the stairs leading to the subways and in the subways. These were 40 and 60 watt.

From approximately January 1, 1938 to August 15, 1938, plaintiff and her sister Margaret took the southbound 4:59 a.m. train every morning. No other transportation was available to them at that hour. About August 15, 1938, Margaret gave up her job in anticipation of her approaching marriage, and thereafter Agnes took the train alone. Plaintiff's home was three blocks west of the railroad and a half block south of 138th street. At that hour of the morning the sisters seldom saw any automobile traffic or people on 138th street. Plaintiff and her sister both testified that in 1937 and 1938 they saw hoboes and tramps once or twice, sometimes three or four times a week, on the Riverdale platform; that occasionally the hoboes would be sleeping and that often the girls were afraid to go into the warming house. Plaintiff also testified that she often saw such men walking on the right of way. Both testified to complaints made to the ticket agent. They testified that a northbound train always arrived 3 or 4 minutes before the southbound train was due, and that 2 or 3 times a week a bus driver got off the northbound train, and that for months no one but themselves boarded either of these trains at that time. They rode on 10 ride tickets, which made each ride between Riverdale and Harvey cost 6 cents. Plaintiff testified that on Tuesday, September 6, 1938, which was the day following Labor Day, she went alone to the Riverdale Station. She followed her regular

route down 138th street and entered the platform from that end. She arrived 10 minutes before her train was due. She walked all the way to the warming house on the north end of the platform. She saw no one on the platform. It was dark, but it was not raining or windy. The platform was brightly lighted at the time. It was a warm day. She went into the warming house. While she was seated in the room a colored man entered, came up to her and pressed his knees against her so she couldn't move. She started to scream and he knocked her to the floor, sitting on her stomach and hitting her with a black-jack. She told him someone was coming and in the confusion got up, passed him, and backed out of the door. She turned immediately and ran screaming down the platform. He caught her toward the south end and knocked her off the platform, at which time her back struck a rail. He jumped down, pulled her under the platform and robbed and raped her. He took two rings and a brooch. He kept her under the platform 3 to 5 minutes and then left on the east side, going north along the tracks. She came out on the same side of the platform and ran down the track toward 138th street. She climbed up on to the platform by some two by four props, nearer 138th street. Just after she got on to the platform the northbound train came up and stopped. She was opposite the middle of this train. She saw the headlight of this train. A bus driver whom she knew, got off the train. She called to him, and he remained with her until her southbound train came along. After she boarded the southbound train she told the conductor what had happened. She got off the train at Harvey and walked to the restau- rant where she worked. She went to the kitchen and washed up and put on her uniform. She did not real- ize that she was badly hurt. In about 10 minutes she tried to walk but could hardly move. Arthur P. Miller, a special policeman for the railroad came in

and accompanied her to the Illinois Central Hospital. She was in the hospital 3 days. The physical examination at the hospital showed that she was suffering from a slight swelling and discoloration of the right side of the neck, a contusion over the left elbow and superficial excoriations of the left shoulder. She returned to the hospital on September 15, 1938. She did not receive any further medical treatment until December 2, 1938, when she visited Dr. Myers. He treated her 12 times. She had no medical treatment since March 29, 1939. She was confined to her bed for about 6 weeks after leaving the hospital. She was sleepless at night and sometimes became hysterical. She also testified to the loss of weight and that she was very nervous. She was off from work for about 14 months. She earned $15 a week, plus tips of from $3 to $5 a week. She went back to work as a waitress in November 1939, and since then has worked daily, except for 2 or 3 days she took off in the summer of 1940.

Defendant maintains that even though it be admitted that plaintiff was a passenger after arriving on its station platform, defendant owed her only the duty of ordinary care, and relies on the case of *Davis v. South Side Elevated R. Co.*, 292 Ill. 378, where the court said at page 384:

"The same degree of care is not required as to the stations and approaches to and from them, because the danger incurred in such surroundings is not the same as on moving trains." A high standard of care is required as to passengers during the course of their transportation, and when they are entering or leaving the vehicle of carriage. This is so because the safety and lives of the passengers rests entirely in the carrier's hands, the passengers having no control whatever over the dangerous instrumentalities employed in their transportation. Consequently, the same degree of care is not required as to the stations and the approaches to them. Defendant admits that timely

notice or knowledge might require special precautions under unusual or emergency circumstances, but maintains there can be no recovery on the theory of such special duty in the absence of evidence showing special notice or knowledge by the defendant. Defendant points out that it was not required to guard against injuries resulting from unusual or unexpected occurrences which could not have been reasonably anticipated. Plaintiff declares that she does not contend that defendant was required to guard against injuries resulting from unusual occurrences which could not be reasonably anticipated. She insists that it was a question of fact for the jury to determine whether or not from all of the evidence, defendant failed to afford her the degree of protection required from dangers of which it had knowledge, or from which, in the exercise of due care and diligence, it could have reasonably anticipated and provided against. There is no dissent by either party from the above statements of the law. The proposition that faces us is the application of these principles to the factual situation before us.

Three police officers of Riverdale and one of the adjoining village of Dolton testified to the network of railroads in and about Riverdale and to the presence of hoboes and tramps in that territory in 1937 and 1938. The Pennsylvania and B. & O. freight lines cross under defendant's elevated tracks at about 136th street. At 140th street the Indiana Harbor Belt line passes from east to west under defendant's tracks in a deep cut. Freight trains of the New York Central, Michigan Central and C. & E. I. also use that line. The main freight and passenger lines of the C. & E. I. ran north and south through Dolton, about a mile east of the Illinois Central. An interchange or "Y" track was located just southeast of the Indiana Harbor subway under the defendant's tracks. This curved track connected the main tracks of the Indiana Harbor and

the defendant and formed a triangle. The elevated tracks formed windbreaks, and hoboes and transients often waited in that triangle to catch trains. Two of the village police officers referred to it as a hobo jungle. All of the freight lines, including the main passenger lines of defendant from the southland, brought in many hoboes, bums and vagrants, white and colored, to the city of Chicago. Two night police officers of Riverdale cruised over the entire village at all times. When complaints came to the Riverdale Police Station, such complaints were relayed to the Chicago Police Department, which broadcasts such complaints over its short wave. Thus, complaints transmitted to the Chicago Police Department can be received over the radio by the Riverdale Police while cruising in their squad cars. Calls sometimes came in of loiterers on the Illinois Central and the police then checked the platforms. Such platforms were often checked during their regular cruising without such calls. These inspections were usually made at 3:00 a.m. Officer Stiemann testified that he found 5 or 6 hoboes a year on the platform. Officer Brookfelt said he had been on the platform about a hundred times during 1937 and 1938, and had taken 25 or 30 transients off in 1938. Both officers had seen hoboes riding on freight trains of all the railroads. Stiemann said the hoboes got off in the village from the Pennsylvania but never from the Illinois Central. Cogswell, a police officer of the village of Dolton, said he helped the Riverdale Police on occasion, and that he had made 3 or 4 inspections at each Illinois Central platform. On several occasions he found transients sleeping in the Riverdale Station. He saw hoboes daily on all railroads in that territory, and on several occasions he had seen them in the triangle at the "Y." He also testified about the area called hobo jungle, which was frequented by hoboes and tramps. Chief Mraz testified that he had seen transients in the triangle, and

on a few occasions he had questioned people on the Riverdale platform. If they were merely resting he would order them to move on. Mr. and Mrs. Schroeder, who lived in the second story of a building directly east of the Riverdale platform, said that almost daily they saw men walking on the right of way. Their windows overlooked the platform. They did not testify that they saw any hoboes on the platform. She testified that on the morning of September 6, 1938, she heard screaming, looked out her bedroom window and saw plaintiff backing away from the warming house with a man following her; that they disappeared when she ran to the front window, from which she had a full view of the platform south of the warming house; that she was still looking when the northbound train came in and she did not see plaintiff again at any time. Mr. Schroeder testified that on occasion he would walk down the railroad right of way and saw other citizens doing the same. The Indiana Harbor Belt Railroad crossed the village in a deep cut at 140th street and south of that was the Little Calumet River. There were no north and south streets for several blocks either way from Illinois Street. Many people walked down defendant's right of way, which was the smoothest and most convenient way to go south from 138th and Illinois streets. The distance by walking on the right of way was 3 miles, and by going around the distance was 6 miles. The officers also testified that colored men worked at a plant in Riverdale. Some came to the station by train and others used the defendant's right of way to walk from the street car at 134th street across the Big Calumet River. On September 6, 1938, a colored man was picked up by Stiemann on the Riverdale platform about 6:20. He was not identified by the plaintiff and was released. There was no testimony that he was a tramp. No such man had been there a short time earlier when Cogswell checked both on and under

the platform. Officer Brookfelt testified from the police daybook that the Riverdale platform had been robbed on January 21, 1938; that on April 17, 1938, at 1:40 a.m., three suspicious boys were brought in; that an investigation showed the gum machine on the station had been broken; that there were three entries of suspicious men at 134th street, all in the afternoon or early evening between January 1, 1938 and September 6, 1938; that there were two records of personal injuries, both in the afternoon; that there was one record of a suspicious man ordered by Officer Stiemann to leave the 134th street station at 3:40 a.m. on August 5, 1938; and that there were 9 entries of "escort" from the platforms. It appears that citizens would be escorted from the station by the police when they telephoned of their expected arrival on a late train. Officer Brookfelt also read a report of a rape which occurred June 23, 1938, three blocks east and a little south of the Riverdale Station. The colored man involved in that case was killed on the scene by the police officers.

The Riverdale Police testified to cooperation with defendant's railroad police. They stated that they and the railroad police both guarded the right of way. During one period when the village police made all trains they saw the defendant's railroad police checking the Riverdale Station 2 or 3 times each night. On September 6, 1938, switchman Burns, traveling north in the caboose of one of defendant's trains, saw a colored man and 2 white boys on the Ivanhoe platform at 12:45 a.m. His train stopped at 134th street and he called the Riverdale Tower on a Company automatic phone and reported the matter. Helton, the towerman, thought Burns had said on the Riverdale platform and phoned to his superior Berschinski. Helton had no city phone to make a direct call to the police. Berschinski received the call at 1:10 a.m. and relayed it to the railroad police office at 95th street,

where the officers check in. Defendant's police lieu-tenant, Payan, got the information at 2:15 a.m., when he checked in by phone. He was then at Matteson and caught the next train to the Riverdale Station, getting there at 2:53 a.m. He made a complete check and saw no one on or about the platform or in the warming house. He then caught the next train south. He was on the platform about 4 minutes. Payan testi-fied that he was in charge of the territory from 63rd to Matteson. He had 10 patrolmen under him, each given a certain territory. Arthur Miller's territory included Riverdale, and he had 10 stations between Riverdale and Matteson. Miller testified that he worked from 6:00 p.m. to 5:00 a.m. He checked the yards at Matteson until 10:00 p.m. after which time his only duty was to patrol the 10 stations in his territory, of which Riverdale was the north limit. As he rode the trains back and forth he had a full view of each station and would get off at any station where he saw anything unusual. Unless he had to get off at an intermediate station, he went to Riverdale on each round trip, getting there 2, 3 and 4 times a night. On September 5, 1938, he took a 10:37 train north from Matteson and stopped at Harvey for a midnight supper. He then took a northbound train to Riverdale, arriving at 11:53 p.m. The next train south was due at 12:17 and he spent the 24 minutes in a complete check of the platform, the freight house and the entire station. He then took the 12:17 south. He did not recall whether he went to Matteson or got off that train at some intermediate station. He re-turned from wherever he was on the next northbound train, arriving at Riverdale at 12:53. On that and later trips to Riverdale he was limited to a 4 minute inspection. The northbound trains arrive about 53 or 54 minutes after each hour and the southbound trains arrive 4 minutes later. He testified that one could see clear down the straight stairs at each end

to check the subway lights, and that a person could see down the west embankment from the edge of the platform. He did not get off the platform or go under it at any time on the later trips. On that night he made 3 or 4 trips to Riverdale. He kept no record of the times. He was told about the assault on plaintiff at 211th street by the conductor on the train she had boarded. He caught the next northbound train to Harvey and interviewed the plaintiff. He testified that when she told him of her experience, he recollected the Riverdale inspections he had made that night at 12:17, 12:53 and 3:56, the last being just an hour before the occurrence. On cross-examination, he stated he had been at Riverdale at 12:53, 1:53, 2:53 and 3:56. He stated he did not see Lieutenant Payan at 2:53, or any other time that night. Plaintiff calls attention to that part of the testimony of Payan and Miller in which they state they arrived at the Riverdale Station at 2:53, and left at 2:55, after having inspected the station, but that neither saw the other. Miller testified he often saw people sleeping on the platform. Men would doze off from a drink or two too many. He would wake them, and if passengers, send them on the next train, waiting with them if they were unable to care for themselves. Outside of those passengers, whom he saw sleeping, he testified he never saw a man sleeping on the Riverdale platform. Miller testified that since the depression a new type of transients are on the railroads. These are young men traveling around looking for jobs. When questioned, they often showed an ad calling for men. He just sent these men on their way. He had often seen regular hoboes and tramps on the trains, yards and right of way. The crew of the northbound train which arrived at 4:53, shortly after plaintiff had been ravished, passed the Riverdale Station southbound at 3:56. Mott, the flagman, and Schaefer, the conductor, testified that there were no loiterers on the platform on either trip that

day. On each trip daily the train stopped where Schaefer could see into the warming house. He often saw passengers waiting, but in three years on this run had never seen a hobo or bum on the platform on either the 4 or 5 o'clock stop. The crew on the southbound train which plaintiff regularly took testified that they had never seen a bum or loiterer on the Riverdale Station or in the warming house on the 5 o'clock run. They testified that the train stopped where they had a clear view into the warming house. The Riverdale Station and the stairs to the subway were brightly lighted all night. There were no phones, sirens, flares or signal devices in the Riverdale Station accessible to passengers, nor are there any signal devices or flares on any suburban platform accessible to passengers. Except phones at loop stations, and one on the platform at Flossmoor, there were no phones on any suburban platform of defendant in Chicago or vicinity, and except in the loop where main line trains stopped, there were no attendants on duty after 10:00 p.m. in any suburban station of the defendant. Frank Price, who lived in Riverdale for many years and had been president of the Village Board, testified that during 1937 and 1938 he met his wife at 137th street on her return from lodge meetings in Chicago. He generally met her between 10 and 11 o'clock at night 5 or 6 times each year. He said: "I observed hoboes and tramps at the station. I have seen dirty unshaven men there, have seen them sleeping in the waiting room."

In support of her argument that defendant had actual knowledge of the alleged dangerous conditions existing at its station, plaintiff cites *Chicago & A. R. Co. v. Pillsbury*, 123 Ill. 9; *Hines v. Garrett*, 131 Va. 125, 108 S. E. 690; *Exton v. Central R. Co. of New Jersey*, 62 N. J. L. 7, 42 Atl. 486. In the *Pillsbury* case (123 Ill. 9) plaintiff, a passenger on a train, was injured when strikers attacked the train. There was,

a labor controversy between a Joliet firm and certain former employees who were on strike. Newly hired employees were transported by the railroad from Joliet to Chicago, where the Joliet firm had a dock. The railroad also transported these new employees back to Joliet at night. The Supreme Court found that a like attack had been made before, two miles distant, upon the laborers being transported. The court pointed out that with regard to danger and hazard to travel arising otherwise than on the train, and not incidents of such travel, the degree of care to be observed to discover and prevent all danger to and consequent injuries to passengers, must depend in a large measure on the attendant circumstances. While the court pointed out that the officers of the railroad did not have knowledge that the rioters intended to attack the train on which plaintiff was riding, it held that defendant ought reasonably to have anticipated that the mob might attack the train to reach the object of their vengeance as soon as the train had passed from the protection of the police, and that precautionary measures should have been taken. The court said at page 24:

"A like attack had been made prior to that time, two miles distant, upon the laborers that had been carried in the box car. On this occasion the mob seems to have been more violent than usual, and the utmost care and vigilance should have been taken to prevent the injury to passengers." The court upheld the verdict and judgment in favor of plaintiff. In the *Garrett* case (131 Va. 125), plaintiff, a girl about 19 years of age, was a passenger on defendant's train, and held a ticket from Washington, D. C. to Seminary, Virginia. Miss Garrett and another passenger were carried past Seminary. This other passenger named Garnett, had the train stopped and got off at a point near his home. The plaintiff was about to get off with Garnett, but the conductor directed her to wait, telling her he in-

tended to back up into the station. Instead, the train moved on, and the second time it was stopped, it was further from the station and alongside a lonely spot which the court said had been for at least a year, infested by hoboes and persons of questionable character. When the train stopped at this spot, a soldier who subsequently raped her, got off on the opposite side. Plaintiff left the train and commenced walking back in the direction of the station. Shortly thereafter she was overtaken by a man dressed in a soldier's uniform and he forcibly carried her across the track and down a high embankment, where he pushed her to the ground and raped her. Within a few minutes thereafter and while she was still trying to rise, another man, dressed in civilian clothes, appeared and raped her a second time. She finally struggled to her feet and was met by two citizens who lived in the neighborhood and escorted her to her home. The court found that there was evidence from which the jury could find that the assaults on Miss Garrett were proximately caused by her wrongful ejection from the train, and said at page 137:

"When once it has been determined that the act is wrongful or negligent, the guilty party is liable for all the consequences which naturally flow therefrom." The court also said at page 137:

"The precise injury need not have been anticipated. It is enough if the act is such that the party ought to have anticipated that it was liable to result in injury to others." The court found that there was evidence that the defendant knew of the dangerous character of the vicinity through which the plaintiff would have to walk in order to reach her destination, and said:

"It is perfectly well settled and will not be seriously denied that wherever a carrier has reason to anticipate the danger of an assault upon one of its passengers, it rests under the duty of protecting such passengers against the same." The court held that the question

of whether defendant was liable was one for the jury. The failure to let Miss Garrett off at the first stop in company with a resident of Seminary, the tortious act of then carrying her still further to a more lonely spot of known danger, and the knowledge by the train crew of the very suspicious fact that a soldier who had not previously wanted to get off, suddenly decided to do so when he saw her ejected, and got off "on the opposite side" are three of the most significant facts in the case. The court also pointed out that the young lady had a cause of action as soon as she was carried beyond her station, and that the care due her was not merely ordinary care and prudence, but the highest degree of care which could be expected from human foresight. In the *Exton* case (42 Atl. 486) Mr. and Mrs. Exton brought action against the railroad for injuries sustained by Mrs. Exton at the hands of third parties. She had entered defendant's depot in New York and purchased her ticket. Her trunk was in the baggage room, and on her way to have the baggage checked she was injured by two men scuffling near the passageway. The two men scuffling were not employees of the railroad, but were cabmen waiting to pick up passengers. The court said at page 488:

"Evidence was also admitted, over objection, and on the defense denied, that very frequently and covering considerable space of time, previous to the occurrence of this accident, these cabmen and hackmen, including the two engaged in the scuffle, on this walkway, and in its immediate vicinity, had indulged in scuffling of a kindred character to that which caused the injury to Mrs. Exton. Many passengers had observed it on their way to the ferry entrance and to the baggage room, and some passengers had been annoyed and incommoded, if not injured, thereby. There is evidence in the case tending to show that the general passenger agent of the defendant had been notified by one or more of the passengers of this state of affairs, and

that other of the employees of the defendant had actual knowledge of these occurrences.'' The Supreme Court of New Jersey, in sustaining the judgment for plaintiff, pointed out that:

''If the defendant had notice or knowledge of what might happen in its depot, or could reasonably anticipate what might happen there dangerous to others lawfully there, it was bound to use care to avoid the injury which might be occasioned, and it would matter little whether the danger was habitually existing or might occur only at intervals.''

Defendant cites *Bellows v. Worcester Storage Co.*, 297 Mass. 188, 7 N. E. (2d) 588; *Thompson v. Monongahela Ry. Co.*, 99 W. Va. 207, 128 S. E. 110; *Peak v. Louisville & N. R. Co.*, 221 Ky. 97, 297 S. W. 1107; *Cole v. German Savings & Loan Society*, 124 Fed. 113; *Henderson v. Dade Coal Co.*, 100 Ga. 568, 28 S. E. 251. In the *Bellows* case a negligently repaired door permitted an insane former employee to break into the warehouse. He cunningly disconnected the fire alarm and set fire to the building, resulting in the total destruction of plaintiff's goods. The court said (7 N. E. page 592):

''In the present case, the only normal or foreseeable result of negligence in failing to repair the door was that some person might enter and steal. What actually happened was harm of a wholly different kind, extraordinary, abnormal, irrational and impossible to foresee. It cannot be attributed to any fault of the defendant.'' In the *Thompson* case it appeared that the passengers on the train had been throwing paper wads, paper drinking cups, banana and orange peeling, etc. Plaintiff was injured when struck on the head by a tin cup by one of these passengers. The court said (128 S. E. page 113):

''The fact that the conductor may have observed passengers throwing paper wads and had warned them against it, was not notice to him that some of

them might accidentally and unintentionally throw a tin cup and injure a fellow passenger.'' In the *Peak* case an intoxicated passenger named Lovelace wandered through the cars talking loudly and boisterously, and committing drunken pranks on the passengers. He was brought back to the smoker by the conductor who turned the seat and told him to go to sleep. He woke up later and indulged in loud talk. Later for no apparent reason he stood up in his seat, whipped out a revolver and started shooting. He killed one passenger and wounded plaintiff and one other. In sustaining the action of the trial court in directing a verdict for the railroad, the Court of Appeals of Kentucky said (221 Ky. page 100):

"In this case the assault was not committed in the presence of any of the train crew. It therefore turns on whether or not Lovelace had been guilty of any prior misconduct which would have induced a reasonably vigilant and prudent conductor or brakeman to anticipate that such an assault might be made. We can find nothing in the record to answer that question in the affirmative.'' In the *Cole* case it appeared that a building elevator was located in a dark, unlighted hall. The elevator door had no lock and was customarily left slightly ajar. Boys had been permitted to visit in, ride upon and sometimes operate the elevator. One of these boys loitering in the hall saw plaintiff approach, opened the elevator door and stepped back. Plaintiff thinking he was the elevator operator stepped through the open door and fell ten and a half feet to the bottom of the shaft, receiving serious injuries. Counsel for the plaintiff argued that the voluntary act of the strange boy in opening the door of the well when the elevator was at an upper floor could and should have been foreseen and anticipated as the probable result of the unlocked door, of the visits of the boy upon the elevator and of his previous attempt to operate it. The court said (124 Fed. page 119):

"This argument loses sight of the fact that the wrongful act of this trespasser was not committed in operating, or in attempting to operate, the elevator, in riding or visiting upon it, or in the doing of any act which he had ever done before. He had never opened the door into the empty well and invited a patron of the elevator to step into it before this accident occurred. How could any one reasonably anticipate that he would be guilty of such an act? The facts that he had visited upon the elevator and had attempted to operate it gave no warning of any such purpose on his part or the probability of any such act." In the *Henderson* case a convict of known brutish and criminal tendencies was negligently permitted to run free by the defendant, to whom he had been leased for convict labor. While free he brutally assaulted and raped the plaintiff. The court said (28 S. E. page 252):

"Vile as this man was, it cannot be held that the defendants could reasonably have anticipated that he would, upon the first opportunity, assault and ravish any defenseless woman whom he might encounter. He was equally liable to commit some other henious crime; and they were not bound to presume that he would commit any crime at all."

We have considered the reasoning of all the cases cited in their application to the factual situation before us. In the *Pillsbury* and *Exton* cases the very thing complained of had previously happened. In the *Garrett* case the railroad committed a wrong in carrying plaintiff beyond her destination and leaving her off where there was a known danger. In the case at bar no rape or anything in any way similar had ever happened previously. The evidence shows that defendant's station was a brightly lighted open platform, with a glassed in lighted waiting room. The whole station was on an elevation above the surrounding territory. It was overlooked by residences and

a school on the east. People could be seen walking on the platform from adjoining streets. They could also be seen by occupants of automobiles a good distance away on 138th street. Eighty trains a day stopped at the platform. The trainmen on those trains could and did look into the warming house and over the platform. The platform was plainly visible from about 70 other trains that passed on adjoining tracks. A village police squad car passed or circled the station at various times during the night and on occasion the village police went up there. Railroad special officers visited and checked the station from two to four times a night. The Riverdale police said their check was usually made at 3:00 a.m. The evidence shows that plaintiff and her sister complained to the station agent. They did not complain that anyone injured or accosted them. They complained that they could not get into the warming house. There is no evidence that there had ever been a crime of violence against a person on the Riverdale platform. Neither the safe-cracking job on January 21, 1938, nor the gum theft on April 19, 1938, were sufficient to charge the defendant with knowledge that rape might be probable the following September. Plaintiff and her sister used the station daily at 5:00 a.m. for several years, yet neither testified to a single incident which might have put defendant on guard. The evidence shows that tramps and hoboes frequented the area known as hobo jungle, approximately two blocks south of the station, and that these men often sought the comfort of the inclosed part of the station. The girls were never molested by these tramps or hoboes. Each morning these girls came through the subway and up the stairs where they were not visible to the surrounding country, with no fear or thought of assault. They waited on the platform without any such fear. Apparently, it never occurred to them that these tramps or hoboes would assault them in this public

place, which was well lighted and where every move could be seen by those in the vicinity, or by passing squad cars. Plaintiff calls attention to the rape of another girl by a colored man near the Riverdale Station on June 23, 1938. The record as to this occurrence does not show that the colored man was a tramp or hobo, and it shows that the crime was committed three blocks east and one block south of the station. The assailant was killed by the police. The fact that a colored man raped a girl three blocks from the station two or three months before the attack in the instant case would not put defendant on notice that such attack would be likely to occur on its property. On September 6, 1938, a switchman, traveling north on a caboose of one of defendant's trains shortly after midnight, saw a colored man and two white boys on the Ivanhoe platform at 12:45 a.m. The switchman reported their presence to the tower man who understood the switchman to say that the man and boys were on the Riverdale platform. Payan a Lieutenant of defendant's police went to the Riverdale platform and made an inspection, but saw no one on or around the platform or in the warming house. At 6:20 a.m. that morning a colored man was picked up by a village police officer on the Riverdale platform. He was not identified by plaintiff and was released. There was no testimony that he was a tramp. It will be observed that the special officers of defendant frequently inspected the Riverdale platform. Applying the principals laid down in the cases we have discussed to the facts of the instant case, we find that the defendant did not have notice or knowledge that plaintiff might be assaulted, nor could defendant reasonably anticipate that such an assault would take place.

The complaint alleged that with knowledge of the condition as to the presence of tramps and hoboes and the commission of crimes and violence, the defendant failed to send anyone to the Riverdale Station

to protect its passengers on the morning of September 6, 1938, after special notice. The only evidence as to this allegation relates to the tramp and boys who were seen loitering on the Ivanhoe platform by the switchman at about 12:30 a.m. on September 6, 1938. There is no evidence of a colored tramp having been seen on the Riverdale platform. A colored man was arrested on the Riverdale platform after plaintiff was raped. There is no evidence that he was a tramp and he was released after plaintiff viewed him and told the police he was not the man who had attacked her. The complaint also charges that defendant failed to provide a station attendant for a reasonable time before the train arrived to protect passengers, including plaintiff, from assault. We cannot find that there was any duty imposed on the defendant to provide an attendant for a reasonable time before the train arrived. Defendant was not put under notice by any condition disclosed by the evidence that an assault would be likely to take place. No assault had theretofore taken place, nor had any been threatened. The complaint also charges that defendant failed to provide on its platform and in its waiting rooms alarms and signal devices accessible to passengers for use in event of imminent danger. Neither the statute nor any regulation of the commerce commission require the installation of any such alarms or devices, nor was it customary for railroads operating in the vicinity of Chicago to provide any such alarms or devices on any of their platforms or waiting rooms. The complaint also charges that defendant failed to post a notice in its station, or otherwise give notice to passengers that the station was infested with hoboes, vagrants, etc., and used by them as sleeping quarters. We do not know of any rule requiring defendant to post such a notice. If the defendant knew or should have known that passengers might be endangered by the presence of hoboes, tramps and

vagrants, it would be the duty of the defendant to guard against such dangers.

Viewing the evidence in its most favorable light from the standpoint of plaintiff's case, we find as a matter of law that she failed to make out a case, and that the court should have granted defendant's motion for a judgment notwithstanding the verdict. Therefore, the judgment of the circuit court of Cook county is reversed, and the cause remanded with directions to enter judgment notwithstanding the verdict for the defendant and against the plaintiff.

*Reversed and remanded with directions.*

Kiley, J., concurs.

Mr. Justice Hebel dissents and cannot concur in the conclusion reached by the majority opinion of this court that the plaintiff cannot recover damages for the assault and rape that was committed by a man who appeared on the railroad station premises of the defendant where the plaintiff went for the purpose of taking and being conveyed by a 4:59 a.m. train to her place of employment. The defendant impliedly invited the plaintiff to use the depot for the purpose of taking a train of defendant as indicated. At the time of the occurrence no employee of the defendant was in charge of this depot. A duty existed on the part of defendant to the plaintiff, going to its station to use its facilities, to keep its premises in a reasonably safe condition for the protection of patrons. (*Milauskis v. Terminal Ry. Ass'n of St. Louis,* 286 Ill. 547; *Trust Co. of Chicago v. New York Cent. R. Co.,* 285 Ill. App. 482; *Newberry v. Baltimore & O. C. T. R. Co.,* 223 Ill. App. 304.) It appears from the record that bums and loiterers who were taking advantage of the "warming room" had been evicted by the police, and of those facts defendant had notice.