# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

Ulysses Houston, Administrator, &c. v. L. B. Strickland,
et al.

March 4, 1946.

Record No. 3021.

Present, All the Justices.

The opinion states the case.

*E. Hagan Richmond*, for the plaintiff in error.

*Bandy & Bandy, Burns & Lively* and *Cecil D. Quillen,* for the defendants in error.

CAMPBELL, C. J., delivered the opinion of the court.

This action was brought by Ulysses Houston, administrator of the estate of William Houston, deceased, to recover damages from L. B. Strickland and the Tri-State Coach Corporation for negligently causing, as alleged in the notice of motion, the death of plaintiff's intestate.

There was a trial by a jury which resulted in a verdict for the plaintiff. At the conclusion of plaintiff's evidence, counsel for defendants moved the court to strike the evidence, on the ground that it was insufficient to sustain a verdict for the plaintiff if the jury should so decide. This motion was overruled by the trial court.

At the conclusion of the evidence for the defendants, counsel again moved the court to strike the evidence of the plaintiff on the ground previously stated. This motion the court overruled.

Upon the return of the verdict in favor of the plaintiff, counsel moved to set aside the verdict rendered and enter judgment for the defendants. This motion the trial court sustained, on the grounds that the evidence was insufficient to sustain the verdict, and that the verdict was contrary to the law.

The action of the trial court in setting aside the verdict of the jury is assigned as error.

The evidence adduced by the plaintiff and defendants on all material points is in direct conflict. Under the well settled doctrine prevailing in this jurisdiction, it is the province of the jury to settle all conflicts in the evidence. This duty the jury has performed and, by its verdict, has resolved all conflicts in the evidence in favor of the plaintiff.

The material allegations of the notice of motion filed by the plaintiff are: That on the .... day of September, 1943, the Tri-State Coach Corporation, a common carrier, owned

and operated a bus line from Kingsport, Tennessee, via Gate City, Virginia, Big Stone Gap, Virginia, and Appalachia, Virginia, to Middlesboro, Kentucky; that L. B. Strickland was the agent of the corporation and operator of the bus used by the corporation for the transportation of passengers on the date above mentioned; that plaintiff's intestate was a passenger on the bus of defendant, by virtue of a ticket held by him which afforded him transportation from Kingsport, Tennessee, to Big Stone Gap, Virginia; "that at the time plaintiff's intestate became a passenger at Gate City he was under the influence of some intoxicating liquor, or not in his right mind from other causes, that he was mentally and physically irresponsible; * * * that he was incapable of protecting himself * * * ;" that four miles from the town of Gate City, plaintiff's intestate was ejected from the bus by the operator, at a point where there was no bus station or place of accommodation for passengers, it being a sparsely settled community; that the night was extremely dark and the time thereof *about* two o'clock a. m.; that the physical and mental condition of plaintiff's intestate was known to Strickland; that at the time of the ejection plaintiff's intestate was not placed under the care of an agent of the corporation but was left upon the State highway where traffic was heavy; and that in less than an hour thereafter he was killed by a motor vehicle.

The first question for our determination is, Is the evidence of the plaintiff sufficient to sustain the verdict of the jury?

Defendants did not dispute the facts, that Tri-State Coach Corporation is a public carrier of passengers, and that L. B. Strickland was its agent and employee at the time of the alleged ejection of plaintiff's intestate. Plaintiff's further presentation of the case to the jury is as follows:

Berry Howard, an employee at the bus terminal in Gate City, testified that he was in charge of the terminal on the night in question; that William Houston came into the terminal and purchased from him a cheese sandwich; that when he came in it was apparent that he was either drinking or something was wrong with him; that he staggered

when he came in the terminal a second time to purchase a sandwich; that he (Howard) told him he had better get out; that his reason for telling Houston to get out was that he was drunk; that Houston knew what he was doing; that he called the deputy sheriff who came to the terminal but was unable to locate Houston.

Henry Neely testified that he was a passenger on the bus when it left Kingsport; that he occupied a seat in the rear of the bus; that he observed Houston; that he noticed Houston was drinking whiskey but was not boisterous or disorderly; that he was mumbling and seemed to be intoxicated; that Houston had a bottle of whiskey and it looked like there was "about a third or half pint, somewhere along there" left in the bottle; that Houston was striking matches; that a Mrs. Manness remarked he might set the bus on fire; that he called Strickland's attention to the fact that Houston was drinking; that Strickland came back to the rear where Houston was sitting and told him, "You have either got to put that liquor up or get off one;" that Houston handed the bottle to Strickland who, in turn, handed it back to Houston and told him to "put it up;" that Strickland started back to the wheel and Houston followed him; that he did not hear Strickland say a "harm word to him;" that Houston was unable to get his suitcase out of the rack and was assisted in getting it out by Paul Whiteaker; that Houston started out of the bus without the suitcase; that he seemed "to walk pretty good;" and got off the bus of his own accord; that when Houston got off the bus it was at a place near two filling stations, but that only one of them was running and it was not open when they went by; that there was "right smart" traffic on the highway at all times, but not so much after midnight.

E. D. Wallen testified that Houston got on the bus at Kingsport; that he noticed "there was something wrong with him;" that he seemed to be "kinda out of humor or something the matter with him;" that when the bus arrived at Gate City he saw Houston in the terminal and heard some of the riders say "the law was looking for him;" that

he heard Strickland say to Houston, "I told you not to drink on the bus and carry on;" that Houston started to hand Strickland the bottle and then took it back; that Houston followed Strickland down the aisle; that some person set the suitcase on the ground.

Lawrence Barker testified that he was a passenger on the bus on the night in question; that he heard the operator tell Houston that if he was going to Big Stone Gap to get on the bus; that Houston started to get on the wrong bus and he said to him, "Brother if you are going to Big Stone Gap you want to get on this bus," and "he got on." Barker further testified:

"A. Everything was going along pretty nice and some guy got up in the back of the bus and come up to the driver and said something to the bus driver; and he stopped the bus and went back and said, 'Give me that liquor or get off,' and the colored fellow he said, 'Where am I at?' And the driver said, 'It don't make a damn,' and some other bus driver said, 'You heard what he said, didn't you?' and the Negro said, 'Yes,' and got up and got off.

"Q. In other words the colored fellow wanted to know where he was?

"A. Yes, sir, he asked where he was.

"Q. And the bus driver said, 'It don't make a damn, you are going to get off here?'

"A. Yes, sir.

"Q. And the other bus driver said, 'You heard what he said?'

"A. Yes, sir.

"Q. And the Negro said, 'Yes, sir,' and got off?

"A. Yes, sir.

"Q. Did he carry his bag out?

"A. No, sir, the other bus driver carried it out.

"Q. How far was that from Gate City?

"A. About the Creed Frazier place.

"Q. About what time of night was it?

"A. It was between eleven and twelve o'clock or twelve and one o'clock.

"Q. Is that the main highway?
"A. Yes, sir.
"Q. From Gate City to Big Stone Gap?
"A. Yes, sir.
"Q. Known as Route 23?
"A. Yes, sir."

G. W. Williams testified that he was sheriff of Scott county at the time of the alleged accident; that at approximately one o'clock in the morning he received a 'phone call stating there was a man dead or drunk at the end of the Daniel Boone yard; that, accompanied by the two boys who discovered the body, he went to the scene; that when he arrived at Kelly Pierson's filling station he saw a suitcase on the left hand side of the road; that one of the boys remarked, "He is gone," and, "He was laying about the white line, in the middle of the road;" that he failed to find the body after a search of the road for a distance of a hundred yards; that he took the suitcase and went back to his home; that later in the night John Frazier came to his home and said to him, "George, a man has been killed up here;" that he went back to the scene with Frazier and found the body of Houston; that the top of the head was mashed and near the white line he found a puddle of blood, and twenty-five yards from there he found blood, glass, papers, slippers and some money; that he found shattered glass in the man's pocket and that he could smell intoxicants on him; that he searched the suitcase and found identifying papers therein; that upon investigation, he ascertained that the body had been run over by a truck driven by one Stewart Parks.

Since our decision in *Veale* v. *Virginia Ry., etc., Co.,* 144 Va. 210, 131 S. E. 200, the legal principles applicable to the action of the trial court in setting aside a verdict have been firmly established. In that case we read:

"In *Forbes & Co.* v. *Southern Cotton Oil Co.,* 130 Va. 245, 108 S. E. 15, Judge Burks quoted with approval the holding in *Morien* v. *Norfolk, etc., Terminal Co.:* 'In *Morien* v. *Norfolk, etc., Terminal Co.,* 102 Va. 622, 46 S. E. 907 (which is strikingly similar to the case in judgment)

the court said: "In such case the preponderance of evidence cannot influence the action of the court in considering a motion for a new trial. The jury may discard the preponderance of evidence as unworthy of credence, and accept the evidence of a single witness upon which to base their verdict, and upon well-settled principles the verdict cannot be disturbed if the evidence of that witness is sufficient, standing alone, to sustain it. Nor is interference with a verdict authorized where the court merely doubts its correctness, or would have found a different verdict. The admissibility of evidence is with the court, but its weight is wholly with the jury." ' "

In the instant case we have this situation: The evidence clearly demonstrates that Houston, when he first became a passenger on the bus of the corporation, was in such a condition that the witness Wallen concluded "there was something wrong with him." When he arrived at Gate City, according to the evidence of Howard, he was staggering and was either drinking or something was wrong with him. This condition so impressed Howard that he called an officer to take Houston in charge. When Houston left the terminal at Kingsport he was confused and had to be told the proper bus to take in order to reach Big Stone Gap. After boarding the bus at Gate City, he began to strike matches, without any apparent attempt to engage in smoking. At no time while a passenger did he engage in boisterous conduct or become disorderly. When informed by Strickland that he would either have to give up the liquor or get off the bus, Houston was apparently unconscious of his location and inquired, "Where am I at?" That he was unable to manage his suitcase is evidenced by the fact that it was carried off the bus by someone else. It is further shown by Williams that the suitcase was placed upon the ground at a point four hundred yards distant from the location of the body.

In our opinion the evidence adduced was amply sufficient to submit to the jury the question of the mental responsibility of Houston. It is fairly inferable from all the facts and circumstances shown by the evidence that his con-

dition was known to Strickland. That it was right and proper for Strickland to warn him that he was violating the law by drinking whiskey on the bus of a public carrier cannot be gainsaid. It is also true that Strickland could have placed him under arrest. However, when it was apparent that he was in a drunken or mental state of irresponsibility, then it was Strickland's legal duty to protect him from the consequences of his own folly.

In 10 Am. Jur., sec. 1277, p. 186, the duty owed by a common carrier to an intoxicated passenger is thus stated:

"While ordinarily a common carrier of passengers is under no duty to protect intoxicated persons from the consequences of their own follies, it owes them certain duties which spring from the relationship of passenger and carrier. A carrier is under no obligation to accept as a passenger one who is intoxicated to such an extent as to incapacitate him from caring for his own safety, but when it does accept such a person as a passenger, it is bound to exercise all the care that a reasonably prudent man would to protect such a person from the dangers incident to his surroundings and mode of travel. The carrier must bestow upon such passenger such care and attention, beyond that given to the ordinary passenger, as is demanded by reasonable prudence and foresight. The fact that the incapacity of the passenger is caused by his voluntary intoxication will not affect this rule."

In *Bragg* v. *Norfolk, etc., Ry. Co.*, 110 Va. 867, 871, 67 S. E. 593, Judge Buchanan said:

"Hutchinson on Carriers (3d Ed.), sec. 1083, in discussing the subject of the right of a common carrier to eject females, sick or intoxicated passengers, says: 'Female passengers and passengers who are sick or suffering from some mental or physical infirmity necessarily cannot be ejected at times and places where the carrier should know that their sex or condition would especially expose them to insult or injury. And this rule is true whether the attendant danger arises from natural infirmity of the person

or was self-imposed. Thus, if a person on a train is so intoxicated as to render him unconscious of danger and unable to appreciate his position, surroundings and perils, and his duty to avoid them, or does not possess the power of locomotion, and is put off the train by the conductor on account of his misconduct, and the place where he is put off and left is dangerous to one in his condition, and these facts are known to the conductor, he would be guilty of recklessness and wanton negligence, rendering the company liable for damages resulting from his negligence, although the person ejected and injured might have been legally ejected in a proper manner and at a proper place. But in order to subject the company to liability for such an act the condition of the person so ejected must be such that it would reasonably indicate to the carrier's servants that he, on account of his condition and the surrounding circumstances, would be liable to injury by being left at the place where ejected.'"

It is not a debatable question that a frequently traveled State highway is a place of hazard for pedestrians. One has only to scan the papers to learn of the daily mounting death toll on the highways. When we apply the rule above stated, we reach the conclusion that in this case the jury might have properly found in favor of the plaintiff. However, it is earnestly argued by counsel for the defendants that Houston was not ejected from the bus, but that he left it of his own volition. Counsel overlook the point that ejection of a passenger is not necessarily confined to the application of forcible means.

In 5 R. C. L., p. 114, this is said: "A passenger, whether right or wrong in any contention or misunderstanding with a conductor, is under no duty, either legal or moral, to remain on the train until the conductor resorts to force for the execution of his commands in expelling him. If the passenger obeys the command to leave the train, and thereby does an act to which his own will does not consent, he is coerced."

■ When we consider the evidence of Barker, that Strickland said, "Give me that liquor or get off one," coupled with the question of Houston, "Where am I at?," and the answer, "It don't make a damn," it is inescapable that Houston did not leave the bus of his own volition. Furthermore, the evidence was such that reasonable men might have differed as to whether Houston, on account of his condition, could be said to have voluntarily left the bus at the point in question. See *Gregory* v. *Seaboard Air Line Ry. Co.*, 142 Va. 750, 756, 128 S. E. 272.

There is a suggestion by counsel that plaintiff failed to carry the burden of showing proximate cause.

■ ■ This suggestion is fully answered by Judge Kelly in *Hines* v. *Garrett*, 131 Va. 125, 137, 108 S. E. 690:

"In the case of *Norfolk, etc., Ry. Co.* v. *Whitehurst*, 125 Va. 260, 263, 99 S. E. 568, 569, Judge Burks, delivering the opinion of this court, said: 'The "forseeableness," or reasonable anticipation of the consequences of a wrongful or negligent act is not the measure of liability of the guilty party, though it may be determinative of the question of his negligence. When once it has been determined that the act is wrongful or negligent, the guilty party is liable for all the consequences which naturally flow therefrom, whether they were reasonably to have been anticipated or not, and in determining whether or not the consequences do naturally flow from the wrongful act or neglect, the case should be viewed retrospectively; that is to say, looking at the consequences, were they so improbable or unlikely to occur that it would not be fair and just to charge a reasonably prudent man with them. If not, he is liable. This is the test of liability, but when liability has been established, its extent is to be measured by the natural consequences of the negligent or wrongful act. The precise injury need not have been anticipated. It is enough if the act is such that the party ought to have anticipated that it was liable to result in injury to others. * * * ' "

The judgment under review will be reversed, and this

court will enter a judgment in favor of the plaintiff for the sum of $1,000, with interest thereon from April 12, 1944.

*Reversed.*

HUDGINS, J., dissenting.

The decision of the case, in my opinion, turns on the condition of William Houston at the time the attention of L. B. Strickland, the bus driver, was called to him *en route* from Gate City to Big Stone Gap.

It is quite true that plaintiff's evidence tends to prove that William Houston was drunk at the bus terminal in Gate City some time before he boarded the bus. However, the only witness who so testified was Berry Howard, but this witness was positive that "he (Houston) was able to take care of himself and to get out (of the terminal) when I told him to get out."

There is no evidence tending to show that the defendants, or either of them, knew that Houston was drunk or drinking at the time he became a passenger on the bus *en route* from Gate City to Big Stone Gap. The pertinent evidence, therefore, is limited to the physical or mental condition of William Houston just before, at the time of and immediately after he left the bus.

While there is some conflict as to the exact words used by Strickland to William Houston, the essential facts are that, after the bus had traveled four or five miles from Gate City, a passenger, Henry Neely, at the request of Mrs. Jessis Manness, informed Strickland that there was a man on the back seat drinking from a bottle and striking matches. Strickland stopped his bus on the side of the road in front of Kelly Pierson's filling station, then closed for the night, walked to the rear of the bus, and, in a low, kindly tone, told Houston that he would have to stop drinking on the bus and surrender his bottle of whiskey until he arrived at his destination or get off the bus. Houston said

something in reply. One of the witnesses said he asked, "Where am I at?" Another said he extended the bottle toward Strickland and then took it back. Strickland turned and started toward the front of the bus, Houston following him. Another passenger, an employee of the Tri-State Coach Corporation but not then in uniform, lifted Houston's bag from the rack and set it on the ground. Houston got off the bus. No force was used to eject him. He was given the choice of refraining from the use of intoxicants on the bus, surrendering temporarily his bottle, or getting off. He made his choice. He walked down the aisle and got off the bus without protest. There is no testimony which tends to show that decedent had lost any of his powers of locomotion or that he was in such a mental or physical condition as to render him unconscious of danger and unable to appreciate his position. It was a comparatively mild September night, there was no rain or fog, and no peril, except the peril incident to traffic on a highway. See *Bragg* v. *Norfolk, etc., Ry. Co.*, 110 Va. 867, 67 S. E. 593.

The fact that Houston was in possession of his mental faculties and able to take care of himself is corroborated by the uncontradicted testimony of Kyle Mullin. This witness stated that, on the same night, he operated a bus which left Gate City within thirty minutes from the time the bus operated by Strickland left. When Mullin approached Kelly Pierson's filling station, he was flagged down by Houston, who, carrying his bag, ran some distance to the side of the bus and asked to be taken to Big Stone Gap. Mullin told him that he did not go any farther than Clinchport. Mullin stated that Houston made no further attempt to board the bus, that he was not drunk and that he seemed to be able to take proper care of himself.

This was Houston's condition at approximately 12:30 A. M., at which time he had a heavy traveling bag and a bottle about one-third full of whiskey. The record is silent as to his movements and the amount of liquor he drank from the bottle during the next few hours. Some time after 3:00 A. M., Houston's body was found on or near the road badly

mangled, and his bag more than one hundred yards from the point at which his body was lying. Just when or how he was killed is not disclosed by the evidence.

The evidence is insufficient to support the verdict of the jury on two grounds, either of which is fatal. 1. The bus driver violated no duty he owed to Houston when he asked him to surrender his whiskey or leave the bus. 2. Houston's leaving the bus was not the proximate cause of his injuries and death. The judgment of the trial court should be affirmed.

EGGLESTON and SPRATLEY, JJ., concur in this dissent.